**BEHRING INTERNATIONAL, INC., Plaintiff,**

v.

**IMPERIAL IRANIAN AIR FORCE, etc., et al., Defendants.**

**Civ. A. No. 79–675.**

United States District Court, D. New Jersey.

July 24, 1979.

Robert W. Delventhal, James M. Terranova, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for plaintiff.

F. Patrick McManimon, McCarthy & Hicks, P. C., Princeton, N. J., Richard P. Brown, Jr., Gaylen J. Byker, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants.

OPINION MAINTAINING RESTRAINTS

CLARKSON S. FISHER, Chief Judge.

This case raises serious questions concerning the interpretation of and the relationship between the Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2891 (codified in scattered sections of 28 U.S.C.) [hereinafter "Immunities Act" or "Act"] and the Treaty of Amity, Economic Relations and Consular Rights Between the United States of America and Iran, August 15, 1955 [1957] 8 U.S.T. 899, T.I.A.S. 3853 [hereinafter "Treaty of Amity" or "Treaty"]. This opinion resolves the defendant's motions to release the restraints on its property and to enter a turnover order, filed April 26 and May 4, 1979 respectively and supersedes my earlier summary opinion, filed May 11, 1979.[1] At issue here is this Court's power to attach defendant's property prior to judgment, over objections to attachment based upon claims of sovereign immunity.[2]

## I. FACTUAL BACKGROUND

### A. *The Parties*

Plaintiff in this action is Behring International, Inc. ["Behring"], a Texas corporation maintaining its principal place of business in Houston, Texas. Behring maintains

1. Defendant filed these motions on April 26 and May 4, 1979. A hearing was held on May 9, 1979. At that time the parties requested that the matter be decided expeditiously, and indicated their willingness to accept an order disposing of the matter to be followed by an opinion at a later date. Rather than simply enter an order, however, I issued a Summary Opinion, filed May 11, 1979, outlining in broad brushstrokes the basis for my decision. This opinion constitutes my formal opinion in this matter and supersedes the Summary Opinion in all respects.

2. Defendant claims only that sovereign immunity bars the prejudgment attachment of its property. It does not claim that it is immune from suit in this Court. *See* n.13 and text at page 388, *infra.*

additional offices in Edison, New Jersey and New York City, and is authorized to transact business in this state. Primarily, Behring is in the business of international commercial freight forwarding. As such, it neither manufactures nor sells goods but, rather, performs specialized services for its clients, who do purchase goods from United States manufacturers and vendors. Those specialized services consist principally of arranging for, or accepting, delivery of the goods on behalf of its clients, preparation of those goods for shipment overseas, and the supervision of the eventual shipment of the goods.

The defendants in this action are the Imperial Iranian Air Force ["I.I.A.F."], the Iran Aircraft Industries ["I.A.C.I."], and the Imperial and Islamic Governments of Iran ["Iran"], and their successors. Both I.I.A.F. and I.A.C.I. were clients of Behring, making frequent use of its international freight forwarding services. Both entities are alleged to be agencies or instrumentalities of Iran.[3] To date, only the Islamic Republic Iranian Air Force ["I.R.I.A.F."], the successor of I.I.A.F., has appeared. Service of process upon all defendants was started through diplomatic channels pursuant to 28 U.S.C. § 1608(a) and (b). As of the May 9th hearing on this motion, however, no return of service had been filed with the Clerk of the Court. On that date, therefore, the time within which the other defendants were required to answer or otherwise respond to the complaint had not yet begun to run.[4]

B. *Events Culminating in this Lawsuit*

Starting in August of 1975, I.I.A.F., predecessor to I.R.I.A.F., contracted with Behring for the performance of freight forwarding services.[5] As the agreement is portrayed in the Verified Complaint, filed February 28, 1979, Behring would arrange to take delivery of goods purchased by I.I.A.F. at the Behring warehouse in Edison, New Jersey. Behring would often expend monies to pay shipping and related expenses incurred in moving the goods from the vendors' premises to plaintiff's warehouse. At the warehouse, plaintiff's employees would prepare the goods on separate pallets for shipment to Iran.

Generally, the goods were shipped *via* I.I.A.F. cargo planes from either Kennedy International Airport or McGuire Air Force Base in New Jersey. I.I.A.F. would notify Behring of the time and place its planes would be available to take on cargo. Behring would then transport the palletized cargo to the appropriate shipment point, where the cargo would be loaded and transported to Iran. Behring would then submit its invoices to I.I.A.F.'s representative in New York City for approval. Upon approval, payment was made under a letter of credit issued in plaintiff's favor by Manufacturer's Hanover Trust Co., New York City, within thirty (30) days of the invoice's approval.

The agreement between Behring and I.I.A.F. proceeded smoothly until the recent political turmoil in Iran.[6] Starting in January of 1979, Behring was unable to communicate with I.I.A.F. officials in Teheran, Iran. In early February, I.I.A.F. ceased flying aircraft to this country. As a result, shipments readied by Behring sat uncollected at either the Edison warehouse or at McGuire Air Force Base. At or about that same time, the I.I.A.F. representative refused to approve payment on any invoices—invoices relating to shipments already forwarded to Iran. As of January 31, 1979 those invoices are alleged to have amounted to $390,494.00. Plaintiff also alleges that at all relevant times there were sufficient

---

**3.** Verified Complaint, filed February 28, 1979, Jurisdiction ¶¶ (ii) and (iii).

**4.** Service has been completed since the hearing date. *See* n.8, *infra.*

**5.** The contract between Behring and I.I.A.F. is appended to the Verified Complaint, *supra*, n.3, as Exhibit B. Since only I.I.A.F.'s successor has appeared and moved in this matter, I omit

any discussion with respect to Behring's dealings with I.A.C.I.

**6.** This Court may take judicial notice of the recent upheaval in Iran and the continuing political uncertainties which it has occasioned. *E. g., Stromberg-Carlson Corp. v. Bank Melli Iran,* 467 F.Supp. 530, 532 n.2 (S.D.N.Y.1979).

funds available under the letter of credit to pay those invoices once approved.

During this two-month interval, plaintiff was faced mostly with unknowns. The political turmoil in Iran left plaintiff in doubt as to the ability of the defendants to honor their obligations. I.I.A.F. personnel in New York City vacated their offices and returned to Iran. The Behring representative in Teheran, Iran, was unable to meet or communicate in any way with I.I.A.F. officials in Iran, and was eventually forced to evacuate the country. Plaintiff instituted this lawsuit on February 28, 1979.

## II. PROCEDURAL HISTORY OF THIS ACTION

Accompanying the Verified Complaint was an Affidavit of Attachment and an application for the entry of an Order to Show Cause why an order should not be entered authorizing the issuance of a writ of attachment of the property of the defendants located at the Behring warehouse. *See Fed.R.Civ.P.* 64; N.J.S.A. 2A:26–1 *et seq.* In the interim, plaintiff sought a Temporary Restraining Order in the nature of an attachment pending the Court's ruling on the Order to Show Cause. The temporary restraints sought prohibited the defendants from removing any of their property from the jurisdiction of this Court or from cancelling the letter of credit issued in Behring's behalf. On the day the suit was brought, the late Honorable George H. Barlow entered the Order to Show Cause, including the Temporary Restraining Order.[7] The return date of the Order to Show Cause was set for March 12, 1979. Due to the fact that service was required to be made pursuant to 28 U.S.C. § 1608, considerable delay occurred before service could be completed.[8] Preferring not to decide the questions raised by the Order to Show Cause without input from the defendants, the return date of the Order to Show Cause was carried numerous times, and argument was finally heard on that matter on June 1, 1979. At all times the temporary restraints were maintained in full force and effect.

It was not until April 26, 1979 that the defendant I.R.I.A.F. retained counsel and appeared in this action. Prior to the return date of the Order to Show Cause, I.R.I.A.F. filed two motions, one calling for the release of all restraints upon its property, and the other requesting the entry of a turnover order directing Behring to release the I.R.I.A.F. property in its possession to I.R.I.A.F.

7. The Order to Show Cause, Temporary Restraining Order, and Summons, filed February 28, 1979, at pp. 2–3 reads in pertinent part:

\* \* \* \* \* \*

2. That pending determination of said Show Cause Order, defendants, . . . , are hereby restrained and enjoined from transferring, removing, sequestering, dismantling, hypothecating or in any other way acting with respect to said material in any manner inconsistent with plaintiff's interest therein; [and]

3. That pending determination of said Show Cause Order, defendants, . . . , are hereby restrained and enjoined from revoking the letter of credit (Exhibit A to Affidavit of Attachment) written in favor of plaintiff and/or from removing any of defendant's property or property in which defendant has an interest from the jurisdiction of this Court and/or the United States to the extent and the amount necessary to satisfy plaintiff's liquidated and unliquidated claims totalling approximately two million dollars;

. . . .

8. Service upon Iran was originally attempted in accord with 28 U.S.C. § 1608(a)(3) by service by a form of mail requiring a signed receipt upon the Ministry of Foreign Affairs of Iran. Service upon the agencies was attempted in accord with 28 U.S.C. § 1608(b)(3)(B), also by a form of mail requiring a signed receipt, upon the agencies themselves in Teheran, Iran. Upon learning that the United States Postal Service had suspended all mail service to Iran, *see* Affidavit of George A. Murphey, filed March 12, 1979, ¶ 3, service was again attempted upon Iran, this time pursuant to 28 U.S.C. § 1608(a)(4) through the Director of Special Consular Services. An Order for Alternative Method of Service was entered pursuant to 28 U.S.C. §§ 1608(b)(3)(C) authorizing service upon the agencies to also be made through the Director of Special Consular Services. A diplomatic note was filed with the Clerk of the Court on July 9, 1979 indicating that the transmittal date of the papers was May 9, 1979. Service was therefore completed on May 9, 28 U.S.C. § 1608(c)(1), and the defendants have sixty (60) days from that date to respond to the Complaint.

Reserving all of the other legal and factual determinations necessary to be made before a writ of attachment could be issued to the adjourned return date of the Order to Show Cause, I.R.I.A.F.'s motions raised for immediate resolution by the Court the actually quite narrow legal question whether the Foreign Sovereign Immunities Act of 1976 prohibits the attachment of the property of a foreign sovereign prior to judgment under the circumstances of this case.[9] This opinion answers only that question and does not attempt to address any other issue connected with the issuance of a writ of attachment pursuant to Rule 65, *Fed.R.Civ.P.,* and the New Jersey Attachment Statute, N.J.S.A. 2A:26–1 *et seq.*

## III. PRELIMINARY LEGAL ISSUES

Before addressing the central legal questions presented by this motion, there are certain preliminary questions involving this Court's jurisdiction over this action and these defendants which must be noted and determined.

■ The central goals of the Immunities Act are to codify the "restrictive theory" of sovereign immunity recognized under international law [10] as the statutory law of this country and to provide that the validity of claims of sovereign immunity interposed in suits against foreign states shall be determined by the United States courts rather than by the State Department. 28 U.S.C. § 1602; H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 14 *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6613 ["H.R. Rep. No. 94–1487"]; *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 638 (S.D.N.Y.1978).

■ Under the provisions of the Immunities Act this lawsuit and the defendant I.R.I.A.F. are properly before this Court. Subject matter jurisdiction exists under 28 U.S.C. § 1330(a), which provides:

(a) The district courts shall have original jurisdiction, without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

Section 1330(a) is applicable because this action is a nonjury civil action; because all defendants are "foreign states" as that

---

**9.** In its moving papers, I.R.I.A.F. urged four grounds in support of its motion for the release of the restraints. They are:

1. Any attachment of the property of a foreign state or its agencies for jurisdiction purposes attempted after the effective date of the [Immunities] is void.

2. Under § 1610(d) of the [Immunities Act] I.R.I.A.F. property is immune from attachment prior to judgment.

3. The I.R.I.A.F. property is immune from attachment under § 1611(b)(2)(B) of the [Immunities Act] because it is intended to be used in connection with a military activity and is under the control of a military authority or defense agency.

4. In the alternative, I.R.I.A.F. reserves, until further investigation is completed, the right to establish that the material in the Edison warehouse are "of a military character" and, therefore, immune from attachment under § 1611(b)(2)(A) of the Act.

I.R.I.A.F. Motion for Release of Restraints On All I.R.I.A.F. Property, filed April 26, 1979, ¶¶ 9–12.

The last of these arguments is expressed in the alternative, and counsel for I.R.I.A.F. did not argue that it supports the immediate release of the property restrained. Indeed, no proof was offered as to the military character of the property to be attached. I therefore express no opinion as to the merits of I.R.I.A. F.'s final argument.

As will be seen, because of the nature of the record before the Court at the time this decision was rendered, I am not required to respond at this time to all of the remaining arguments raised by I.R.I.A.F.

**10.** *See generally* Note: Sovereign Immunity of States Engaged in Commercial Activities, 65 *Colum.L.Rev.* 1086 (1965), about the difference between the traditional absolute immunity principle and the modern "restrictive" theory, as well as a discussion of the United States courts' prior practice of deferring to recommendations of the State Department regarding the propriety of claims of sovereign immunity, rather than determining such claims for themselves. *See also* H.R.Rep. No. 94–1487, *supra,* at 6–9 [1976] U.S.Code Cong. & Admin.News at pp. 6604–08.

term is defined in 28 U.S.C. § 1603(a);[11] because the claim asserted by Behring is one for relief *in personam*;[12] and because, as shall be seen below, the defendant is not entitled to immunity *from suit*[13] by virtue of both 28 U.S.C. § 1605(a) and the Treaty of Amity.

Having subject matter jurisdiction under 28 U.S.C. § 1330(a), this Court may exercise personal jurisdiction over the defendants under 28 U.S.C. § 1330(b)[14] so long as the service provisions of 28 U.S.C. § 1608 are met. Service was in fact made upon the defendant I.R.I.A.F. pursuant to 28 U.S.C. § 1608(b)(3).[15]

With respect to immunity from suit, I.R.I.A.F. recognizes that it is not, in fact, immune from suit in this matter.[16] Section 1604 sets out the sole source of a foreign state's immunity from the jurisdiction of courts of the United States.[17] It states the general rule that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States . . . ." 28 U.S.C. § 1604. The immuni-ty granted in section 1604, however, may be waived in two ways, first, it is subject to existing international agreements to which the United States is a party at the time of the enactment of the Immunities Act, and, second, by engaging in activities described in the statutory exceptions established by 28 U.S.C. §§ 1605–1607. Both of these waivers are applicable here.

■ One of the statutory waivers of immunity set out in the Immunities Act states:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> \*      \*      \*      \*      \*      \*
>
> (a) in which the action is based upon a commercial activity carried on in the United States by the foreign state

. . . .

28 U.S.C. § 1605(a)(2).

"Commercial Activity" is defined by the Act to mean "either a regular course of

---

**11.** Section 1603(a) defines a "foreign state" to include agencies or instrumentalities of a foreign state. Section 1603(b) defines an "agency or instrumentality of a foreign state" to mean any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof, and

(3) which is neither a citizen of a state or of the United States as defined in section 1332(c) and (d) of [Title 28], nor created under the laws of any third party.

28 U.S.C. § 1603(b). All parties agree that Iran and I.R.I.A.F. are foreign states as that term is defined above. *Cf. Edlow International Co. v. Nuklearna Elektrarna Krsko,* 441 F.Supp. 827 (D.D.C.1977) (holding that the defendant was *not* an agency or instrumentality of a foreign state).

**12.** This Court has no doubt that this action is a proceeding *in personam* against the defendants, and not one *in rem* or *quasi in rem. See infra,* n.26.

**13.** It is important to note that the Immunities Act deals both with a foreign state's immunity from the jurisdiction of United States courts, *see* 28 U.S.C. §§ 1604–1607, and with the im-munity a foreign state's property enjoys from attachment and execution. *See* 28 U.S.C. §§ 1609–1611. In this case it is the second form of immunity which is the source of the controversy. It is the first form of immunity, however, which is determinative of this Court's subject matter jurisdiction under 28 U.S.C. § 1330(a).

**14.** Section 1330(b) reads:

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

**15.** In addition to service upon I.R.I.A.F. pursuant to 28 U.S.C. § 1608(b)(3)(C) and (a)(4), *see* n.8, *supra,* service was also attempted upon the I.R.I.A.F. representative in New York City, Colonel Khatami, at his home. *See* 28 U.S.C. § 1608(b)(2).

**16.** Under the Immunities Act sovereign immunity is an affirmative defense which must be specifically pleaded. · The burden is upon the foreign state to "produce evidence of its claim of immunity". H.R.Rep. No. 94–1487, *supra,* at 17; [1976] U.S.Code Cong. & Admin.News, p. 6616.

**17.** *Id.*

commercial conduct or a particular commercial transaction or act". 28 U.S.C. § 1603(d). The commercial character of the activity is to be determined not by reference to the purpose of the activity but by reference to its nature. *Id. See National American Corp., supra,* 448 F.Supp. at 641; *United Euram Corp. v. Union of Soviet Socialist Republics,* 461 F.Supp. 609 (S.D.N.Y.1978). To be considered "carried on in the United States", the commercial activity of a foreign state need only have "substantial contact" with the United States. 28 U.S.C. § 1603(e). *See East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. 383 (S.D.N.Y.1979).

■ It is obvious that I.R.I.A.F. was engaged in commercial activity carried on in the United States. I.R.I.A.F. was engaged in using its cargo planes to ship goods purchased in this country to Iran. Its contract with Behring obligated Behring to prepare those goods for shipment by I.R.I.A.F. The contract was negotiated and executed in New York City; I.R.I.A.F. maintained an office there, and it regularly sent its planes to this country to pick up cargo. Thus, I.R.I.A.F. has waived its jurisdictional immunity by engaging in commercial activity carried on in this country. 28 U.S.C. §§ 1604, 1605(a)(2). *See United Euram Corp., supra,* 461 F.Supp. 609; *Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384 (D.Del.1978); *Upton v. Empire of Iran,* 459 F.Supp. 264 (D.D.C.1978); *National American Corp., supra,* 448 F.Supp. at 640–641.

■ A second waiver of jurisdictional immunity is to be found in the Treaty of Amity. Section 1604 expressly establishes that existing international agreements to which the United States is a party survive the Immunities Act. H.R.Rep. No. 94–1487, *supra,* at 10, 17–18; [1976] U.S.Code Cong. & Admin.News, at pp. 6608, 6616. *See also Carey v. National Oil Corp.,* 453 F.Supp. 1097 (S.D.N.Y.1978).[18] The Treaty of Ami-

ty is just such an agreement. Article XI, paragraph 4, of the Treaty of Amity provides:

No enterprise of either High Contracting Party [referring to the United States of America and Iran], including corporations, associations, and *government agencies and instrumentalities,* which is publicly owned or controlled shall, if it engages in *commercial,* industrial, shipping or other business activities *within the territories of the other* High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment, or other liability to which privately owned and controlled enterprises are subject therein.

Treaty of Amity, *supra,* art. XI, para. 4 [1957] 8 U.S.T. at 909 (emphasis added).[19] Since I have already stated that I.R.I.A.F. was engaged in commercial activity within the United States, the waiver of immunity contained in the Treaty of Amity also prevents I.R.I.A.F. from claiming immunity from this Court's jurisdiction to hear and determine this action.

For all of the foregoing reasons, I.R.I.A.F. is not immune from the jurisdiction of this Court, and I must conclude that this suit and the defendant-I.R.I.A.F. are properly before me at this time.

## IV. CONTROLLING LEGAL ISSUES

As narrowed by the briefs and memoranda submitted by the parties and the affidavits before the Court, the legal questions determinative of plaintiff's present entitlement to a pre-judgment attachment of I.R.I.A.F. property in its Edison warehouse facility are:

(1) Whether I.R.I.A.F. property may be attached prior to judgment because of the statutory waivers of immunity contained in section 1610(b) or (d) of the Immunities Act; and

---

**18.** The survival of the Treaty of Amity is crucial to the central dispute about whether prejudgment attachment of I.R.I.A.F. property is authorized in this case. *See* discussion in text, *infra,* at 393–395.

**19.** No party has argued, and I have found no other indication, that the Treaty of Amity has been abrogated by the recent political upheaval in Iran. This opinion is, therefore, based upon the assumption that the Treaty is still valid.

(2) Whether I.R.I.A.F. property may be attached prior to judgment because of the waiver of immunity contained in the Treaty of Amity, a waiver which survives the enactment of the Immunities Act.[20]

▮ Any resolution of these questions must begin with the Immunities Act.[21] The appropriate starting point within the Act is section 1609, which states:

> Subject to existing international agreements to which the United States is a party at the time of the enactment of this Act the property in the United States of a foreign state shall be immune from attachment, arrest or execution except as provided in sections 1610 and 1611 of this chapter.[22]

Section 1609, paralleling section 1604, establishes as a general rule that the property of a foreign state is immune from attachment. Two broad exceptions are carved out of this general rule. First and foremost, the immunity from attachment granted by section 1609 to a foreign state's property is, as is the immunity from suit granted by section 1604 to the foreign state itself, *see* text at 389, *supra*, subject to existing international agreements to which the United States was a party at the time the Immunities Act was enacted. The Treaty of Amity, therefore, survives section 1609, as it survives section 1604. Second, the general rule of immunity from attachment is modified by the exceptions set out in sections 1610 and 1611.

If the pre-judgment attachment of I.R.I.A.F. property is authorized, therefore, it must be authorized either by the text of the Immunities Act itself, or by the Treaty of Amity.

A. *Is I.R.I.A.F. Property Subject to Attachment Prior to Judgment Because of the Statutory Waivers of Immunity Contained in Section 1610(b) or Section 1610(d) of the Immunities Act?*

1. *Section 1610(b).*

▮ Contrary to Behring's initial argument, section 1610(b) of the Immunities Act does not authorize the attachment of a foreign state's property prior to judgment. Section 1610(b) establishes that, upon the meeting of certain conditions, a foreign state's property "shall not be immune from

---

**20.** These questions have become the focus of this opinion only by the process of argument and counterargument by the parties. When Behring first sought a writ of attachment pursuant to Fed.R.Civ.P. 64 and N.J.S.A. 2A:26–1, *et seq.*, it recognized the possible existence of a defense of sovereign immunity. It anticipated and countered the defense by arguing that the Immunities Act, 28 U.S.C. § 1610(b)(1) and (2), waived any immunity from pre-judgment attachment of property. *See* Plaintiff's Brief in Support of its Order to Show Cause and Verified Complaint, at 26–29. I.R.I.A.F. disputed Behring's interpretation of the Act and argued that the Act waives immunity from pre-judgment attachment of a foreign state's property only in the limited circumstances described in 28 U.S.C. § 1610(d), circumstances, it argued, which were not present. *See* Memorandum of Law In Support of Motion For Release of Restraints From All I.R.I.A.F. Property, at 9–11. Behring's response was twofold. First, it argued, assuming the correctness of I.R.I.A.F.'s interpretation of section 1610(b), that the requirements of section 1610(d) were met. Second, it argued that the Treaty of Amity survived the enactment of the Immunities Act and that the Treaty authorized the use of pre-judgment attachments as a provisional remedy. *See* Memorandum of Law In Opposition to I.R.I.A.F.'s Motion For Release of Restraints From

All I.R.I.A.F. Property and For Turnover Order, at 7–12 and 25–33. I.R.I.A.F. in turn disputed both of these contentions.

**21.** Both the Immunities Act and the Treaty of Amity are acts of the domestic sovereign entitled to equal weight under the Constitution. The later of the two acts will, therefore, supply the governing rule of law in the event that the two acts conflict. *E. g., Akins v. United States,* 551 F.2d 1222, 1229–30 (Cust. & Pat.App.1977). In this case the Immunities Act is the more recent sovereign act. *See generally* 1A Sands, *Sutherland Statutory Construction,* §§ 32.01 & 32.06 at 378 (4th ed. 1972).

**22.** Historically, unless otherwise waived, the property of a foreign state was immune from attachment in any form, except as a basis for obtaining *in rem* or *quasi in rem* jurisdiction over the foreign state. Even then, however, the property attached for the purpose of obtaining jurisdiction could not be executed upon to satisfy a judgment. H.R.Rep. No. 94–1487, *supra,* at 26, 27–28; [1976] U.S.Code Cong. & Admin.News at pp. 6625–26. Section 1609 is not merely a codification of this rule. It also modifies it by prohibiting the pre-judgment attachment of property in aid of jurisdiction. *Id.* *See* n.26, *infra.*

attachment in aid of execution, or from execution, *upon a judgment* entered by a court . . . ." 28 U.S.C. § 1610(b) (emphasis added).[23] If the language of the Act is not clear enough, then the legislative history demonstrates without a doubt Congress' intent to exclude pre-judgment attachments from the term "attachment in aid of execution". *See* H.R.Rep. No. 94–1487, *supra*, at 28; [1976] U.S.Code Cong. & Admin.News at p. 6627. This conclusion is even further buttressed by the explicit provision made for "attachment prior to the entry of judgment" in section 1610(d). I must therefore conclude that section 1610(b) does not waive I.R.I.A.F.'s immuni-ty from pre-judgment attachment of its property.[24]

## 2. *Section 1610(d).*

■ Pre-judgment attachment of property is therefore authorized by the Immunities Act only under the narrow exception set out in section 1610(d). That section waives immunity from attachment of property prior to judgment only on the concurrence of two conditions: (1) the foreign state must "explicitly" waive such immunity; and (2) the purpose of the attachment must be to secure payment of a judgment which may be entered in the future.[25] Al-

---

**23.** 28 U.S.C. § 1610(a) and (b) reads:

§ 1610. Exceptions to the immunity from attachment or execution

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property—

(A) which is acquired by succession or gift, or

(B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment.

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in com-mercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act if—

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), or (5), or 1605(b) of this chapter, regardless of whether the property is or was used for the activity upon which the claim is based.

**24.** By interpreting section 1610(a) and (b) in this manner I need not consider whether the other conditions imposed by those subsections are met.

**25.** 28 U.S.C. § 1610(d) reads:

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachments prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

though the second of these conditions is met, the first is undoubtedly lacking.

I must reject Behring's assertion that article XI, paragraph 4, of the Treaty of Amity, quoted *supra* at page 12, constitutes the *explicit* waiver of immunity from pre-judgment attachment required by section 1610(d). A comparison of section 1610(a) and (b), quoted *supra* n. 23, with section 1610(d), quoted *supra* n. 25, reveals that Congress did not intend to allow implied waivers of immunity from attachment prior to judgment under the Immunities Act.

■■■■ I must conclude that section 1610 does not provide a statutory basis for subjecting I.R.I.A.F. property to pre-judgment attachment in this action. *See Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F.Supp. 1165 (D.Md.1978).[26]

B. *Is I.R.I.A.F. Property Subject to Attachment Prior to Judgment Because of the Waiver of Immunity Contained in the Treaty of Amity?*

In the alternative, Behring argues that in the Treaty of Amity, Iran, on behalf of itself and its agencies, waived any immunity from attachment its property may have previously enjoyed. This argument assumes, first, that the Treaty of Amity was not abrogated by the Immunities Act, and, second, that its language can reasonably be read to effect a waiver of immunity from pre-judgment attachment of its property.

■■■■ I have repeatedly indicated my belief that the Immunities Act does not abrogate any existing international agreement to which the United States was a party prior to the Act's enactment. Congress was obviously careful not to abrogate existing agreements by the passage of the Immunities Act. To the extent such international agreements set forth a waiver of immunity, those agreements are to be given effect. It is only if such agreements are silent as to immunity that the Act supplies the governing rule of law.[27] Article XI, paragraph 4, of the Treaty of Amity is not silent on the issue of immunity. I.R.I.A.F. recognizes the force of these arguments and concedes that the Treaty is in full force and effect today.

All immunity provisions . . . are made subject to "existing" treaties and other international agreements to which the United States is a party. In the event an international agreement conflicts with this bill, the international agreement would control. . .

Treaties of friendship, commerce and navigation and bilateral air transport agreements often contain provisions relating to the immunity of foreign states. Many provisions in such agreements are consistent with but do not go as far as, the current bill. To the extent such international agreements are silent on a question of immunity the bill would control; the international agreement would control only where the conflict is manifest. H.R.Rep. No. 94–1487, *supra*, at 17–18; [1976] U.S.Code Cong. & Admin.News at p. 6616. *See also* 28 U.S.C. § 1330(a) and H.R.Rep. No. 94–1487, *supra*, at 13; [1976] U.S.Code Cong. & Admin.News at p. 6611; 28 U.S.C. § 1609 and H.R.Rep. No. 94–1487, *supra*, at 26; [1976] U.S.Code Cong. & Admin.News at p. 6625. And, although the House Report gives as an example treaties which do not go as far as the Immunities Act in waiving immunity, it would seem that treaties containing greater waivers of immunity would also be given full force and effect.

**26.** A careful reading of sections 1609 and 1610 reveals that I.R.I.A.F. is correct in its assertion, *see* n.9 ¶ 1, *supra*, that the Immunities Act does not authorize pre-judgment attachment of property as a device for obtaining jurisdiction. H.R.Rep. No. 94–1487, *supra*, at 26; [1976] U.S.Code Cong. & Admin.News at p. 6625 states: "[N]either section 1610 nor 1611 would permit an attachment for the purpose of obtaining jurisdiction over a foreign state or, its property." *See National American Corp., supra*, 448 F.Supp. 622. The Immunities Act's provision for *in personam* jurisdiction eliminates, to a large degree, any need for attachments in aid of jurisdiction.

Agreeing with I.R.I.A.F. does not, however, help it obtain the relief sought. True, the Immunities Act does not authorize attachment in aid of jurisdiction, but that is not what occurred here. Behring's attachment is designed to insure the payment of a judgment which may be rendered in its favor in the future. Jurisdiction was in fact obtained in conformity with the Immunities Act. I therefore need not address the difficult question of whether jurisdictional attachments, if authorized by the Treaty of Amity, would survive the Act and still be an acceptable method of commencing suit against this particular foreign state.

**27.** In explaining the savings clause of section 1604, the House Report states:

The ultimate question becomes, therefore, whether the Treaty of Amity waives immunity from pre-judgment attachment. Unfortunately, there are no cases construing this specific Treaty language to guide me.[28] All that I have before me is the relevant language of the Treaty, again found in article XI, paragraph 4, wherein the parties waive, for themselves and *for their property*, immunity "from taxation, suit, execution of judgment, *or other liability to which privately owned and controlled enterprises are subject therein* " (emphasis added).

■ Before proceeding to answer that question, I must resolve a preliminary question regarding the proper principles of construction to be applied. I.R.I.A.F. argues that, since section 1610(d) requires an explicit waiver of immunity from pre-judgment attachments, I should also require one in construing the Treaty of Amity. Because of my earlier ruling that the Treaty does not constitute the explicit waiver required by section 1610(d), I would therefore be forced to conclude that the Treaty does not authorize/this attachment. I disagree.

The Immunities Act is not a statute governing the construction of prior treaties but is one of substantive law. Sections 1610(a) and (b) inform litigants about the circumstances in which the property of a foreign state will be available to satisfy a judgment. Section 1610(d) sets out the much narrower circumstances in which pre-judgment attachment will be allowable. The provisions govern not existing international agreements, but the everyday commercial agreements between contracting parties, such as that between I.R.I.A.F. and Behring. The explicit waiver required by section 1610(d) could be satisfied by the provisions of the contract between the parties, or even by their conduct during the course of their commercial dealings. The requirement of an explicit waiver in section 1610(d) however, cannot be read to modify the savings language of section 1609. Section 1610(d) does not require the drafter of a 1955 treaty to anticipate the requirements of a law that will be passed twenty-one years later. In recognition of these realities, Congress inserted a savings clause in section 1609 (as well as in sections 1330(a) and 1604) and I therefore need not find an explicit waiver in the Treaty in order to find that pre-judgment attachment is proper. Ordinary principles of construction are all that I need apply.

I find the logic of this conclusion compelling. The United States and a foreign state will, in future treaties, be free to determine what waivers of immunity are desired by the parties in a particular case. If waivers differing from the general rules set out in the Immunities Act are desired, they will be able to modify those general rules accordingly. Congress has recognized that past decisions as to the appropriate immunity to be retained in a specific situation, which may or may not differ from what is now the general rule set forth in the Act, should be honored. In this respect, Congress chose to regard treaties and other international agreements to which the United States is a party very differently from ordinary commercial agreements between United States citizens and foreign states. In other words, my decision would be different if I were construing a waiver contained in an ordinary commercial agreement which was entered into prior to, or subsequent to, the enactment of the Act. I am, however, construing a treaty, deserving of special treatment.

---

**28.** Three other bilateral treaties to which the United States is a party have come to the Court's attention containing substantially identical waivers of sovereign immunity. They are the Treaty of Friendship, Commerce and Navigation Between the United States of America and the Republic of Korea, November 28, 1956, Art. XVIII, par. 2 [1957] U.S.T. 2217; T.I.A.S. 3947; the Treaty of Friendship, Commerce and Navigation Between the United States of America and Japan, April 2, 1953, Art. XIX, par. 2; [1953] 2 U.S.T. 2063; T.I.A.S. 2863, and the Treaty of Friendship, Commerce and Navigation Between the United States of America and the Italian Republic, February 2, 1948, Art. XXIV, par. 6; [1949] 63 Stat. 2255, T.I.A.S. 1965. However, none of these treaties' waivers of immunity clauses have been authoritatively construed by the courts.

Applying ordinary principles of construction, see 1A Sands, *Sutherland Statutory Construction*, § 32.09 (4th ed. 1972), I must conclude that the Treaty of Amity authorizes this attachment. Behring has argued that the "or other liability" language of article XI paragraph 4 shows that the specific language preceding it was meant by way of illustration and not limitation; that it is a nonexclusive list of situations in which immunity is waived. The listing of "execution of judgment" must waive immunity from attachment in aid of execution, *compare* § 1610(a), (b). The "or other liability" language must refer to situations other than attachment after the entry of judgment—including the use of pre-judgment attachments as a provisional remedy. Although I.R.I.A.F. strongly contests this construction of the provision, I believe it to be the better interpretation.

It is apparent from my reading of the Treaty that the United States and Iran desired that they be treated like ordinary private parties in the other's courts. *Cf.*

---

**29.** *Pfizer* involved the Government of Iran's attempt to bring an anti-trust action against an American corporation to collect damages on behalf of Iranian citizens on a *parens patriae* theory. It is well settled under the anti-trust laws that a state of the United States could not bring such an action. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Relying in part upon Art. III, par. 2 of the Treaty of Amity, the Court of Appeals held that the plaintiff did not have "the right to press their citizens' claims in a manner barred to domestic states vis-a-vis their 'citizens' " 522 F.2d at 618 & 619 n.9. Although certainly not directly apposite to the case before me, *Pfizer* indicates that a foreign state's rights under the Treaty are no different than those of a domestic state. By analogy I can reason that the United States and Iran desired that their status would be similar to that of other litigants, whether as plaintiff, or defendant, in the other's courts.

**30.** As was previously stated, *see* n.9, *supra*, I have not felt it necessary to address all other arguments raised by I.R.I.A.F. in its moving papers. Most importantly, this opinion leaves unresolved the applicability of I.R.I.A.F.'s third argument, regarding 28 U.S.C. § 1611(b)(2)(B), which states:

(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

\* \* \* \* \* \*

*Pfizer, Inc. v. Lord*, 522 F.2d 612 (8th Cir. 1975), *cert. denied*, 424 U.S. 950, 96 S.Ct. 1421, 47 L.Ed.2d 356 (1976) (involving Iran's rights under the Treaty of Amity as a plaintiff).[29] Such treatment would of course include liability to pre-judgment attachment of property.

I therefore conclude that the Treaty of Amity authorizes pre-judgment attachment of I.R.I.A.F.'s property under the circumstances of this case, and that I.R.I.A.F. is not entitled to an order releasing all restraints from its property.[30]

## CONCLUSION

Summarizing my conclusions with respect to the Immunities Act: First, only section 1610(d) curtails the immunity from pre-judgment attachment enjoyed by the property of a foreign state under section 1609. Second, Behring has not shown that section 1610(d) is applicable here because it cannot point to any explicit waiver of immunity from such attachments.

(2) the property is, or is intended to be, used in connection with a military activity, and

\* \* \* \* \* \*

(B) is under the control of a military authority or defense agency.

Although this third argument raises serious questions about whether section 1611 governs in spite of prior international agreements, or is merely a codification of prior law, I need not resolve them now because there has been an utter failure of proof on the issue of who controls the property restrained by I.R.I.A.F. in support of this motion. The Verified Complaint alleges that all of the property now restrained in its warehouse is under Behring's control and that Behring is neither a military authority nor a defense agency. *See* Verified Complaint, *supra*, ¶¶ 11, 13. I.R.I.A.F., which has the burden of proving a defense of immunity, *see* n.16, *supra*, has offered no testimony or any other form of proof that contradicts these verified allegations. Even if the law is as I.R.I.A.F. claims, it would not be entitled to the release of all restraints on its property on the basis of the record before me. Since I.R.I.A.F. desires the resolution of this motion expeditiously, but a ruling in its favor cannot aid it, I decline to answer the question at present. *See National American Corp., supra*, 448 F.Supp. at 641–42.

With respect to the Treaty of Amity, my conclusions may be summarized as follows: First, it survives the Immunities Act. Second, the intent of the parties as of the time of the signing governs. Third, it is my task to determine that intent in accordance with ordinary rules of construction. Fourth, I believe that the parties intended that they be treated like any private person. Pre-judgment attachment of the property was proper. Defendant's motion for the release of restraints is denied. In light of this decision, I.R.I.A.F.'s motion for a turnover order must also be denied. An order has been entered in accord with this opinion.