## E–SYSTEMS, INC.

v.

## ISLAMIC REPUBLIC OF IRAN and Bank Melli Iran.

No. CA–3–79–1487–G.

United States District Court,
N. D. Texas,
Dallas Division.

June 19, 1980.

Harold Hoffman, Jess C. Rickman, III, Gardere, Wynne & Jaffe, Dallas, Tex., for Bank Melli Iran and Republic of Iran; Louis P. Bickel, Bickel & Case, Dallas, Tex., of counsel.

Thomas G. Shack, Jr., Abourezk, Shack & Mendenhall, Washington, D. C., for E-Systems, Inc.

## ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This lawsuit arises out of a contract struck on December 23, 1973, between an American manufacturer and the Imperial Iranian Government Ministry of War. E-Systems agreed to modify, repair, and improve two aircraft owned by Iran. E-Systems furnished, as agreed, bank guarantees to secure its proper performance and to secure any down payments on advances made on the contract by Iran. When this suit was filed two bank guarantees issued by Bank Melli Iran[1] providing that it would pay up to $2,990,700 and $1,500,000 to the "Imperial Government Ministry of War" upon the latter's written request were outstanding. Each guarantee was backed by a letter of credit from the Bank of America National Trust and Savings Association, payable to Bank Melli upon its demand. E-Systems was in turn obligated to indemnify Bank of America for any sums paid to Bank Melli under the letters of credit.

As a result of Iran's alleged failure to pay E-Systems or to pay certain American suppliers, E-Systems brought this suit in December, 1979. On December 6, 1979, this

---

1. According to E-Systems, Bank Melli Iran has from its inception been wholly owned by the Iranian government.

court granted a writ of attachment against those aircraft and related property. On February 27, 1980, the court entered a temporary restraining order later extended to March 20, restraining Bank Melli from causing Bank of America to pay it under Bank of America's two letters of credit. On March 5 the Islamic Republic of Iran asked the Judicial Panel on Multidistrict Litigation for an order transferring related Iranian actions for consolidated or coordinated pretrial proceedings in accordance with 28 U.S.C. § 1407. On March 6, Bank Melli filed its motion to dismiss for want of jurisdiction, to deny a preliminary injunction, to set aside entry of default, and for other relief. On March 14, Iran filed a motion to dismiss for want of jurisdiction and other relief, including a stay in this cause pending action by the Judicial Panel on Multidistrict Litigation.

E-Systems and Bank Melli agreed, in the form of a joint motion, to extend the temporary restraining order to and including a date ten (10) days after the Panel disposed of the pending application. In spite of the order providing for such extension, on March 28, Bank Melli demanded payment from Bank of America under its letters of credit in the amount of $4,490,700, which Bank of America did not pay. If it had done so, E-Systems would have been required to reimburse Bank of America. Instead, relying on the Iranian Assets Control Regulations, at 44 Fed.Reg. 75354 (1979) (to

be codified in 31 C.F.R. § 535.568)[2], Bank of America notified E-Systems that it had received demand for payment. Relying on 31 C.F.R. § 535.568(b), E-Systems then applied for, and received, specific license from the U.S. Treasury Department authorizing it to "establish a blocked account"[3] on its books in the name of Bank Melli. Through the expedient of a paper entry in the records of E-Systems, Bank of America was not required to immediately pay Bank Melli, in turn, staying E-Systems' obligation to reimburse Bank of America for any funds paid to Bank Melli. In essence then, it appears that Bank of America continues to hold the $4,490,700 it would otherwise have had to send Bank Melli and E-Systems has on its book an entry designated "blocked account" in favor of Bank Melli for $4,490,700.

E-Systems seeks to amend its complaint to add claims against Bank Melli and the Islamic Republic for wrongfully making demand against the letters of credit and has applied for a writ of attachment against "the property of Defendant Bank Melli Iran," specifying the "blocked account that has been established upon the books of E-Systems, Inc."

In light of the filing of a suggestion of interest by the United States, this court stayed proceedings pending a decision by the Panel. The Panel having ruled on May 7, Docket No. 425—In re Litigation Involving the State of Iran (Islamic Republic of

---

2. 44 Fed.Reg. 75354 (1979) (to be codified in 31 C.F.R. § 535.568) provides in pertinent part:

(a) Notwithstanding any other provision of law, payment into a blocked account in a domestic bank by an issuing or confirming bank under a standby letter of credit in favor of an Iranian entity is prohibited by § 535.201 and not authorized, notwithstanding the provisions of § 535.508, if either (1) a specific license has been issued pursuant to the provisions of paragraph (b) hereof or (2) eight business days have not expired after notice to the account party pursuant to paragraph (b) hereof.

(b) Whenever an issuing or confirming bank shall receive such demand for payment under a standby letter of credit, it shall promptly notify the person for whose account the credit was opened. Such person may then apply within five business days for

a specific license authorizing the account party to establish a blocked account on its books in the name of the Iranian entity in the amount payable under the credit, in lieu of payment by the issuing or confirming bank into a blocked account and reimbursement therefor by the account party.

3. The Iranian Assets Control Regulations do not explicitly define the term "blocked account." Its meaning is intimated by the stated purpose of the Regulations. The purpose is to "block" assets in the sense that transactions in property subject to the jurisdiction of the United States or which is in the possession or control of persons subject to the jurisdiction of the United States in which Iran or its entities has an interest are prohibited in the absence of a license from the Treasury Department. *See* 44 Fed.Reg. 65956 (1979) ("Summary").

Iran), that this action will not be consolidated with other Iranian actions, the court became free to deal with the pending motions in this case. On May 8, the court by letter to counsel, posed a number of questions related to the issue of prejudgment attachment in this case.[4] Counsel have replied and the issue of prejudgment attachment is ripe. The court cannot now rule, however, upon all issues because certain issues raised by defendants in their March 6 and 14 motions require more briefing. Specifically, the court is not prepared to now decide the issue of whether this court has personal jurisdiction over the defendants.[5] Personal jurisdiction was raised in the defendants' March motions as well as in the defendants' recent responses to the court's query.

I.

E-Systems seeks to attach the "blocked account" on its books. E-Systems describes that "account" as "a contingent liability to Bank Melli in the amount of $4,490,700." Application for Writ of Attachment, at ¶ 5. But for the license issued under § 535.568(b) of the Iranian Assets Control Regulations, Bank of America would have paid $4,490,-700 into a blocked account in a domestic bank belonging to Bank Melli, and E-Systems would in turn have been obligated to reimburse Bank of America. E-Systems obtained a license under § 535.568(b), Bank

of America did not transfer the money to Bank Melli, and E-Systems' obligation to reimburse was not triggered.

At the outset we confront the question of whether the present arrangement (a § 535.-568 licensed blocked account) creates a sufficient property interest to be subject to levy by E-Systems. Bank Melli argues that the "blocked account" licensing arrangement is a device to allow American businesses to escape payments otherwise unconditionally due; that the obtaining of a license to establish a blocked account and its creation is a Treasury department taking of security provided by American businesses to Iranian entities.

E-Systems replies that it has substituted itself for Bank of America and that it may attach the receivable due Bank Melli as if it were money due Bank Melli by Bank of America; that the entry on its books under the Regulations "substitute[s] an account on its books for the funds on an account on Bank of America's books." Supplemental Brief of E-Systems, Inc. in Reply to Motions of Islamic Republic of Iran and Bank Melli Iran to Dismiss, To Deny Attachment of Blocked Account, and For Other Relief, at 1–2.

Bank Melli argues that the § 535.568 licensed blocked account at E-Systems bears little resemblance to property; that even were the licensing arrangement a perfect

---

**4.** The Panel's May 7 order denied the transfer of the actions before it to a single district under § 1407, but stated that:

[The] decision is without prejudice to the right of any party to move for transfer of any subgroup of actions listed on Schedule A and/or additional actions, provided that a properly substantiated showing of compliance with the Section 1407 statutory criteria is made.

Relying on this language, Iran moved the Panel to transfer this and certain other cases on May 28. On June 6 Iran moved this court for an order staying all proceedings pending action by the Panel on Iran's May 28 motion. The Panel will apparently hear the motion on June 26.

In the absence of a suggestion of interest from the United States in relation to this May 28 motion, and in view of the delays in this case which have already occurred, the court will deny the motion to stay.

**5.** In particular, the court requests argument regarding the relevance, if any, of "minimum contacts" with either Texas or the United States on the court's personal jurisdiction over the defendants, especially in light of article XI, paragraph 4 of the Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, *infra. See, e. g.,* Kahale & Vega, *Immunity and Jurisdiction: Toward a Uniform Body of Law in Actions Against Foreign States,* 18 Col.J. Transnat'l L. 211, 244–52 (1979). If there is such a requirement here, are there indeed the requisite contacts as to both defendants? In addition, Iran has recently asserted that there is a clause in the contract which provides that any lawsuit over the contract must be filed in the courts of Iran. What is the effect, if any, of such a forum selection clause given the present state of American-Iranian relations and disorders in Iran?

substitution of E-Systems for the Bank of America as the obligor, E-Systems would still be attempting to attach its own debt due Bank Melli, because the obligation to pay Bank Melli is not an asset in E-Systems' hands. It is a debt.

E-Systems had not pointed to any provision of the Regulations which explicitly supports the idea that licensed accounts, as here, simply effects a substitution of custodians, relying instead on a series of inferences. First, E-Systems asserts that "[i]f it was intended that the issuing bank remain liable to the beneficiary of the letter of credit, the Regulations would have simply said that in lieu of payment, the issuing bank shall set up a blocked account on its books. There would be no need to create an additional obligor for the same debt." Id. at 1. Second, it says that the Treasury Department "apparently agrees with this interpretation, since it requires proof of financial responsibility of the bank's customer before it will issue the license." Id. Third, it argues that "Bank of America agrees with this interpretation, because it has advised Bank Melli that hereafter it should look to Plaintiff for funds."

None of these arguments are persuasive. The first argument fails because if the issuing bank set up a blocked account on its books, it may have had to set aside funds specifically for this purpose, thereby forcing the account party to reimburse the bank. This may have significant financial ill-effects on account parties, especially smaller, undercapitalized American firms. The second argument fails because the Treasury Department may well have required proof of financial responsibility to remove a risk to the bank: if the bank's customer is financially unsound by the time the Regulations are lifted, the bank which then pays the Iranian entity might not be able to obtain effective reimbursement from the account party. The third argument fails as well. Bank of America's cable to Bank Melli Iran of April 7, 1980, notified the latter that E-Systems had informed Bank of America of the establishment of a § 535.568 blocked account on the books of E-Systems, saying in part "E-Systems, Inc.

also stated it will be directly responsible to Bank Melli under the license." If it were clear under the Regulations that E-Systems would be substituted for the Bank of America in liability for the $4,490,700, there would have been no necessity for E-Systems to tell Bank of America that it would be directly responsible to Bank Melli. Bank of America wired that it was "acting under the assumption the matters set forth in the telex [it] received from E-Systems Inc. are true and correct" and suggested that Bank Melli direct inquiries relating to the letters directly to E-Systems; it did not affirmatively state that Bank of America's responsibilities had ended.

Thus, none of these arguments make plain that the Bank of America no longer has any liability and that direct liability of E-Systems to Bank Melli has been substituted therefor. Indeed there is strong evidence otherwise. First, the very lack of explicit provision for substitution of liability gives us pause. Substituting the debt of an American corporation for the debt of an American bank takes away a thing of value to the creditor. And to engage in such a wholesale rearrangement of liabilities without explicit provision in the Regulations is an inappropriate judicial task considering the interstitial function of courts. Second, there has been no suggestion made that E-Systems has segregated from its total assets any money for the "account." Without such segregated funds the blocked account is no more than a notation of debt due.

The economic reality of the standby letter of credit arrangement, earlier bargained for, was that the Iranian Government was entitled in the event of a dispute with an American corporation, to immediately obtain cash and litigate later. Without judgment upon its wisdom or necessity under the present international situation, the effect of the § 535.568 "blocked account" arrangement is, effectively, to take away this right in order to protect American corporations from being forced to immediately pay out on facts such as these. It does not change the identities of the American debtors.

This fictional device, the § 535.568 blocked account, cannot be levied upon. In Texas, attachment may be levied only upon such property as is subject to levy under writ of execution. Tex.Civ.Stat.Ann., tit. 13, art. 288 (Vernon). And "[n]o property or interest in property is subject to sale under execution or like process unless the debtor, if sui juris, has power to pass title to such property or interest in property by his own act. . . ." *Moser v. Tucker*, 87 Tex. 94, 26 S.W. 1044, 1045 (1894), *quoted in, Shaw v. Frank*, 334 S.W.2d 476 (Tex.Civ. App.—El Paso 1959). Moreover, "not every interest in property a debtor may have a right to, or to acquire, may be subjected to sale under execution, or otherwise, for payment of his debts; for, in many instances, his right is so remote and contingent that it is deemed more likely to subserve the ends of justice, not so to subject it." *Id.* at 481. Bank Melli cannot, in any meaningful sense, transfer its interest in the so-called "account" because there is nothing to transfer; there is no debt running from E-Systems to Bank Melli that E-Systems can attach because, as discussed above, E-Systems has not been substituted in liability for Bank of America. Even if E-Systems indeed were substituted for Bank of America in liability to Bank Melli, E-Systems would be attaching its own debt; E-Systems has not offered any Texas authority suggesting that a debtor can attach its own debts.

In summary, the entry on the books of E-Systems would be subject to levy only if it had the character of property and a debtor could attach its own liability. It is doubtful whether either of these conditions is present. However, we do not hold irrevocably that both conditions are here absent. In view of the fact that there have been continual changes and clarifications in the Iranian Assets Control Regulations, and such a change or clarification may alter our conclusions, and in view of the still murky state of the record before the court as to what the "blocked account" in question con-

sists of, the court rests its denial of attachment on the failure to date of E-Systems to show a property interest subject to attachment and on the Foreign Sovereign Immunities Act bar, to which we now turn.

## II.

Even were the court to assume that what was sought to be attached was indeed property of Bank Melli and that a debtor can attach its own liability, there would be a further hurdle. The Foreign Sovereign Immunities Act of 1976,[6] which became effective on January 19, 1977, sought to change and codify the substantive law of foreign immunity in the United States, and to make its application more uniform, fair, and predictable by transferring responsibility for determining claims of immunity from the State Department to the courts. Brower, Bistline & Loomis, *The Foreign Sovereign Immunities Act of 1976 in Practice*, 73 Am.J. Int'l L. 200, 200 (1979). It provides the text for any exegesis of whether the prejudgment attachment sought is permissible.

28 U.S.C. § 1609 states:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment, arrest, and execution except as provided in sections 1610 and 1611 of this chapter.

Thus § 1609 establishes as a general rule that the property of a foreign state is immune from attachment, with two exceptions. First, any existing international agreement providing for waiver of the immunity from attachment is preserved. *Cf. Reading & Bates Corp. v. National Iranian Oil Co.*, 478 F.Supp. 724, 728 (S.D.N.Y.1979). Second, the statute itself contains two exceptions in §§ 1610 and 1611. *Cf. Behring Int'l v. Imperial Iranian Air Force*, 475 F.Supp. 383, 391 (D.N.J.1979). And finally,

---

**6.** E-Systems admits that Bank Melli is subject to the Foreign Sovereign Immunities Act. Supplemental Brief of E-Systems, Inc. in Reply to

Motions of Islamic Republic of Iran and Bank Melli Iran to Dismiss to Deny Attachment of Blocked Account, and for Other Relief, at 7.

certain property is offered an additional layer of protection from attachment. Section 1611(b) provides, among other things, that:

> Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—
>
> . . . . .
>
> (2) the property is, or is intended to be, used in connection with a military activity and
>> (A) is of a military character, or
>> (B) is under the control of a military authority or defense agency.

The only "international agreement" which may be applicable under Section 1609 in this case appears to be the Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, 8 U.S.T. 901, signed on August 15, 1955. *Behring International, Inc. v. Imperial Iranian Air Force, supra*, at 391; *Reading & Bates Corp. v. National Iranian Oil Co., supra*, at 728.[7] Article XI, paragraph 4 of the Treaty provides:

> No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

The courts in *Behring* and *Reading & Bates* agreed that paragraph 4 did not explicitly waive prejudgment attachment. The court in *Behring* found an implicit waiver: the listing of "execution of judgment" must waive immunity from attachment in aid of execution and that the "or other liability" language which follows must refer to situations other than attachment after the entry of judgment, including the use of prejudgment attachments as a provisional remedy. *Id.* at 393–95. This dependence upon the construction of the residual phrase, "or other liability" is vulnerable to the principle that a waiver of immunity ought not be lightly implied. *Cf. Reading & Bates Corp. v. National Iranian Oil Co., supra*, at 728–29; Carl, *Suing Foreign Governments in American Courts : The United States Foreign Sovereign Immunities Act in Practices*, 33 S.W. L.J. 1009, 1043 (1979).

When the Treaty was signed, attachment of a foreign sovereign's assets would not have been allowed. American practice recognized an absolute immunity from attachment even in those cases where courts found no jurisdictional immunity.[8] Del Bianco, *Execution and Attachment Under the Foreign Sovereign Immunities Act of 1976*, 5 Yale Studies in World Public Order 109, 110–11 (1978). It is thus unreasonable to infer from less than exact language that the signatories intended to permit prejudgment attachment as to assets of the commercial enterprises of the foreign sovereign by the Treaty.[9]

---

7. Bank Melli, E-Systems, and Iran agree that this Treaty is still in force. Defendant Bank Melli Iran's Supplemental Brief in Opposition to Prejudgment Attachment of Assets and In Support of Defendant's Motions for Other Relief, at 22. Supplemental Brief of E-Systems, Inc. in Reply to Motions of Islamic Republic of Iran and Bank Melli Iran to Dismiss, to Deny Attachment of Blocked Account, and for Other Relief, at 15–16. Defendant Islamic Republic of Iran's Supplemental Brief in Opposition to Prejudgment Attachment of Assets and in Support of Defendant's Motions for Other Relief, at 16.

8. In 1959, the State Department changed its position slightly, adopting a policy permitting pre-judgment attachment of state property, but only for the purpose of gaining jurisdiction in quasi-in-rem actions. Del Bianco, *infra*, at 112 and 143 n.107.

9. In *New York and Cuba Mail Steamship Co. v. Republic of Korea*, 132 F.Supp. 684 (S.D.N.Y. 1955), a suit was filed in admiralty to recover for damages sustained by libellant's steamship, process in personam with writ of foreign attachment issued pursuant to which the Republic of Korea's funds on deposit in New York banks were attached. In one order, entered a month before the signing of the Treaty, the court followed the State Department's suggestion that Korea's property is immune from at-

■ It follows from the language and legislative history of §§ 1610(a)[10] and 1610(b)[11] that they do not waive a foreign government's immunity from prejudgment attachment. *See Carl, supra,* at 1042; *Behring International, Inc. v. Imperial Iranian Air Force, supra* at 391–92. "Prejudgment attachment of property is . . authorized by the Immunities Act only under the narrow exception set out in section 1610(d)."[12] *Id.* at 392. Section 1610(d) provides that prejudgment attachment of property "used for a commercial activity in the United States" is not immune to such attachment if (i) the foreign state has explicitly waived such immunity *and* (ii) the purpose of the attachment is to secure satisfaction of a judgment which may be entered.

**[6]** Even assuming that the attachment E-Systems seeks is against the requisite kind of commercial property, it appears

tachment and seizure, and vacated the attachment. Judge Weinfeld stated:

> The suggestion before me states explicitly that the principle of the immunity of a foreign government's property from attachment and seizure is not affected by the State Department's favorable attitude towards the restrictive theory of sovereign immunity, and that the Department is in agreement with [Korea's] contention that its property "is not subject to attachment in the United States." Thus by its own interpretation of immunity, the Department of State declares in unmistakable language that it adheres to the doctrine that the property of a foreign government is immune from attachment.

(footnote omitted). *Id.* at 686.

**10.** 28 U.S.C. § 1610(a) provides:

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property—

(A) which is required by succession or gift, or

(B) which is immovable and situated in the United States: *Provided,* That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment.

**11.** 28 U.S.C. § 1610(b) provides:

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act if—

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), or (5), or 1605(b) of this chapter, regardless of whether the property is or was used for the activity upon which the claim is based.

**12.** 28 U.S.C. § 1610(d) provides:

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

that because Iran has not explicitly waived such immunity, § 1610 would not provide a statutory basis for subjecting Bank Melli's assets to prejudgment attachment. *Cf. id.* at 393 ("I must reject . . . [the] assertion that article XI, paragraph 4, of the Treaty . . . constitutes the *explicit* waiver of immunity from pre-judgment attachment required by section 1610(d)"). Thus under the Foreign Sovereign Immunities Act, Bank Melli's assets would not be subject to pre-judgment attachment.[13]

■ A question arises as to whether the prejudgment immunity thus offered by the Act are eliminated by certain provisions of the Treasury Department's Iranian Assets Control Regulations.[14]

The Regulations provide, at 44 Fed.Reg. 67617 (1979) (to be codified at 31 C.F.R. ¶ 535.504):

(a) Subject to the limitations of paragraphs (b) and (c) of this section, judicial proceedings are authorized with respect to property in which on or since the effective date there has existed an interest of Iran or an Iranian entity.

(b) This section does not authorize or license:

(1) The entry of any judgment or of any decree or order of similar or analogous effect upon any judgment book, minute book, journal or otherwise or the docketing of any judgment in any docket book, or the filing of any judgment roll or the taking of any other similar or analogous action.

(2) Any payment or delivery out of a blocked account based upon a judicial proceeding, nor does it authorize the enforcement or carrying out of any judgment or decree or order of similar or analogous effect with regard to any property in which Iran or any Iranian entity has an interest.

(c) A judicial proceeding is not authorized by this section if it is based on transactions which violated the prohibitions of this part.

A subsequent addition to the Regulations, 44 Fed.Reg. 75353 (1979) (to be codified at 31 C.F.R. ¶ 535.418) provides that:

The general authorization for judicial proceedings contained in § 535.504(a) includes pre-judgment attachment. However, § 535.504(a) does not authorize payment or delivery of any blocked property to any court, marshal, sheriff, or similar entity, and any such transfer of blocked property is prohibited without a specific license. It would not be consistent with licensing policy to issue such a license.

The Office of Foreign Assets Control of the Treasury Department explains that § 535.-504 was needed "to authorize judicial proceedings to deal with a large volume of cases which are anticipated, and which will meet the terms of the new section." 44 Fed.Reg. 67617 (1979) ("Summary"). And that agency explained that "[n]ew section 535.418 makes clear that § 535.04 authorizes pre-judgment attachments, but does not authorize any payment or delivery of blocked property to a court, marshal, sheriff or similar entity." 44 Fed.Reg. 75353 (1979) ("Supplementary Information").

While the matter is not free from doubt, it does not appear that §§ 535.504 and 535.-418 were intended to abrogate the detailed attachment provisions of the Foreign Sovereign Immunities Act as to Iran. Neither the language nor the accompanying explanatory information give any such indication. The sections instead appear to reflect the Treasury Department's effort to permit the full range of judicial proceedings involving Iran and its entities then extant to continue, despite what a broad reading of 44

---

**13.** This immunity from pre-judgment attachment does not depend on the assets sought to be attached falling under the "military" assets provision of the Act. *See* Del Bianco, *supra,* at 118–23.

**14.** We assume without deciding that such Regulations could displace the Act as a result of

the President having delegated his sweeping powers under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.,* to the Treasury Secretary to carry out the provisions of the President's order blocking Iranian government property. 44 Fed.Reg. 65729 (1979).

Fed.Reg. 65956 (1979) [to be codified in 31 C.F.R. § 535.201(a)] would proscribe:[15]

(a) No property subject to the jurisdiction of the United States which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized;

Indeed, § 535.418 refers to § 535.504(a) as a "general authorization for judicial proceeding" and that this authorization "includes pre-judgment attachment." The Treasury Department apparently thought that certain prejudgment attachments were permissible against some Iranian entities (as characterized by the Regulations) before adoption of the Regulations. If the Treasury Department wishes to abrogate the existing law of prejudgment attachment of assets of foreign countries as to Iran and its entities, it could do so in a clearer fashion. And because its authority is not without question, it must do so.

### III.

The writ of attachment against the two aircraft and related property belonging to Iran granted by this court on December 6, 1979, must be dissolved. The analysis of immunity from prejudgment attachment of Bank Melli's assets under the Act despite the Treaty providing for waiver of immunity from "other liability" is applicable to Iran's airplanes and related property as well, with one minor difference.[16]

We do not reach the possibility that Iran and its noncommercial entities are protected from prejudgment attachment for a reason independent of the court's interpretation of the term "or other liability." The United States has argued in another Iranian case that the treaty waiver of Article XI, ¶ 4, *supra*, "does not apply to the property of the Contracting States as such and of their non-commercial agencies and instrumentalities, but . . . it applies only to the property of publicly-owned or controlled commercial or business enterprises of the Contracting States." *See* Brief for the United States as Amicus Curiae, *Electronic Data Systems Corp., Iran v. Social Security Organization of the Government of Iran*, 610 F.2d 94 (2d Cir. 1979), at 4. The United States notes that had the contracting parties intended to deal with the immunity of contracting parties as such, "they undoubtedly would have expressed that intent singly and directly. For example, the subject of the sentence [in Article XI, ¶ 4] might have read "Neither High Contracting Party, nor its publicly owned or controlled corporation, associations, agencies and instrumentalities . . . ." *Id.* at 8–9. The United States further stated:

A straightforward reading of Article XI, paragraph 4, of the Treaty of Amity

---

**15.** This has since been revised. *See* 45 Fed. Reg. 24432 (1980).

**16.** E-Systems offer two procedural reasons why the attachment cannot be dissolved now. First, they assert if Iran "opposes the attachment, its remedy is to file a motion to dissolve the writ of attachment. See Rule 608, Texas Rules of Civil Procedure. Such rule provides that the motion shall admit or deny each finding of the order of attachment, and provides for an evidentiary hearing. No such hearing has been sought." Second Supplemental Brief of E-Systems, Inc., at 3. Nothing prevents this court from exercising its inherent authority to reconsider its earlier orders.

Second, E-Systems relies on the fact that writs of attachment were levied against the same property in two other cases while a third, a garnishment suit, E-Systems answered by stating that it had the two aircraft and related property in its possession, but asserting vari-

ous defenses. E-Systems states that it would be unfair to dissolve the writ of attachment in favor of E-Systems while leaving in effect other writs of attachment and writs of garnishment against the same property in favor of others. E-Systems can claim no entitlement to an improper decision of law; even the "new property" does not extend so far. Moreover, this court having granted one of those other writs will also dissolve that one.

Again, the court does not deal with the question of whether an additional layer of immunity may be available under the "military" assets provision of the Act, § 1611(b)(2). *Compare* Defendant Islamic Republic of Iran's Supplemental Brief in Opposition to Prejudgment Attachment of Assets and in Support of Defendant's Motions for Other Relief, at 8–10 *with* Second Supplemental Brief of E-Systems, Inc., at 4–6.

with Iran does not reveal an intent to waive the immunity of the Contracting States as such and of their noncommercial agencies and instrumentalities.

The immunity waiver provision as typified in Article XI of this treaty was used, with minor variations, in fourteen FCN treaties [treaties of friendship, commerce, and navigation] negotiated between 1948 and 1958, eleven of which are currently in force. The records of the Department of State which bear upon the negotiating history of the waiver provision in these treaties confirm that the waiver was not intended to be applicable to the Contracting States as such and their non-commercial agencies or instrumentalities. Rather, it was intended to refer to publicly-owned or controlled commercial or business enterprises of the Contracting States. Contemporaneous public documents clearly reflect this understanding of the immunity waiver provision on the part of the Department of State and the Senate Committee on Foreign Relations. . . . [T]his interpretation also finds support in writing of former officials of the Department of State who played significant roles in the negotiation of the FCN treaties.

*Id.* at 6–7.

The United States' analysis is not insubstantial. But without full briefing on the particular issue raised by the United States brief in the Second Circuit case, the court rests its vacating of the attachment of the airplanes and related property solely on its interpretation of the Treaty and the Act as outlined in section II. *Cf.* Brief of Plaintiff-Appellee Electronic Data Systems Corporation Iran, *Electronic Data Systems Corp., Iran v. Social Security Organization of the Government of Iran,* 610 F.2d 94 (2d Cir. 1979).

## IV.

The issues posed by this litigation, especially that of prejudgment attachment of the "blocked account" on the books of E-Systems, are difficult ones: the Foreign Sovereign Immunities Act is unfamiliar terrain, the Iranian Assets Control Regulations, being necessarily written in haste (as is this Order), are not clear, and are as ephemeral as the factual basis of this litigation. The court must make decisions despite the legal uncertainties of this case, trying to ensure in each instance that it does not stray from the benchmark of government by laws in this time of high emotion.

For these reasons, the court asked for briefing on May 8 and is asking for additional briefing now. For similar reasons, the court must emphasize that its decision to deny E-Systems' application for a writ of attachment against the "blocked account" on its books is subject to reconsideration. For instance, such reconsideration is advisable if later legal developments cast doubt on this court's construction of the Treaty or the absence of property subject to levy.[17]

In sum, the court:

1. Dissolves the writ of attachment granted E-Systems on December 6, 1979, in its entirety.

---

**17.** Counsel have not directed the court's attention to any instance when the United States addressed the issue of whether prejudgment attachment of the assets of Iranian-owned commercial enterprises is permissible, other than as in the United States' brief in the Second Circuit E.D.S. litigation; there the argument seems to have been gratuitous. In its brief in the Second Circuit E.D.S. litigation, the United States only addressed the issue of whether the Social Security Organization of the Government of Iran, the Ministry of Health and Welfare of the Government of Iran, and the Government of Iran "have explicitly waived their immunity from attachment prior to entry of judgment, within the meaning of 28 U.S.C. § 1610(d)(1)." *Id.* at 1 & 3. The United States did not directly confront the issue of whether an entity such as Bank Melli, perhaps best characterized as a publicly-owned business enterprise of Iran, is also subject to prejudgment attachment. But in its brief therein, the United States seems to suggest that such enterprise would be subject to prejudgment attachment. Indeed, the United States would not have argued so vigorously that the waiver provision of the Treaty is not applicable to Iran or its non-commercial agencies if otherwise. However, in the absence of the proffer of any opinion of the United States which discusses fully the implications of the triggering of the waiver provision with its ambiguous "other liability" phrase, the court will, for the reasons outlined in Section II, deny E-Systems' pending application.

2. Denies E-Systems' application for writ of attachment filed April 4, 1980.

3. Grants E-Systems leave to amend its complaint to add claims against Bank Melli and the Islamic Republic.

4. Directs E-Systems to brief more fully the issue of personal jurisdiction, within twenty (20) days.

5. Directs Iran and Bank Melli to inform the court as to which of the numerous reasons for dismissal they offered in their March motions they still wish to offer for consideration in light of the intervening events and to brief more fully the issue of personal jurisdiction, within twenty (20) days.

6. Denies the Motion of Defendant the Islamic Republic of Iran for a Stay of Proceedings.