**CHICAGO BRIDGE & IRON COMPANY, Plaintiff,**

v.

**The ISLAMIC REPUBLIC OF IRAN et al., Defendants.**

**No. 80 C 2864.**

United States District Court, N. D. Illinois, E. D.

Nov. 12, 1980.

---

Michael M. Conway, Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., for plaintiff.

Daniel J. Cheely, Baker & McKenzie, Chicago, Ill., for defendant Lummus Co.

Stephen M. Murray, Lord, Bissel & Brook, Chicago, Ill., for defendant Morrison–Knudsen Co., Inc.

Robert T. Grueneberg, Asst. U.S. Atty., Chicago, Ill., for suggestion of U.S. interest.

Thomas G. Shack, Jr., Abourezk, Shack & Mendenhall, P.C., Washington, D.C., Donald C. Shine, Howington, Elworth, Osswald & Hough, Chicago, Ill., for all Iranian defendants but Bank Melli.

Daniel P. Levitt, Kramer, Levin, Nessen, Kamin & Soll, New York City for Bank Melli.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiff Chicago Bridge & Iron Company filed suit against twelve Iranian and American defendants alleging breach of contract, lost profits, conversion of equipment and expropriation of funds. Plaintiff has now filed a motion to attach the American assets of the Islamlic Republic of Iran and seven Iranian–controlled corporations–National Iranian Oil Company, Shahpur Chemical Company, Iran–Japan Petrochemical Co., Lavan Petroleum Company, Iran Pan American Oil Co., Iran Carbon Co. and Bank Melli Iran (collectively, "Iranian defendants".[1] The motion was made prior to the Iranian defendants' appearance in this action, and we have asked plaintiff to file a memorandum on the issue of personal jurisdiction.[2] The defendants have now appeared by counsel and have filed their own briefs on this question.

---

1. Plaintiff does not seek to attach the assets of two nongovernmental Iranian defendants, Norm Engineering Company and Farbal Co.

2. While personal jurisdiction is generally waivable and can only be raised by the parties, the Foreign Sovereign Immunities Act of 1976 ties personal jurisdiction to the substantive question of sovereign immunity. See p. 983, of text *infra*. Sovereign immunity is, in fact, given jurisdictional status for both subject matter and personal jurisdictional purposes. *International Association of Machinists and Aerospace Workers v. OPEC*, 477 F.Supp. 553, 565 (C.D. Cal.1979). Since it is the duty of a court to scrutinize continually its power to act, *Warner v. Territory of Hawaii*, 206 F.2d 851, 852 (9th Cir. 1953), it is not inappropriate for us to examine *sua sponte* the existence of jurisdiction, both subject matter and personal, to the extent they are intertwined.

The starting point for our analysis is 28 U.S.C. § 1330,[3] which was added to the United States Code in 1976 by enactment of the Foreign Sovereign Immunities Act ("FSIA" or "the Act"), 28 U.S.C. § 1602 *et seq.* It gives federal district courts subject matter and personal jurisdiction over nonjury civil claims against foreign states, provided they are not entitled to sovereign immunity under 28 U.S.C. §§ 1605–1607 or pre–existing international agreements. The transactions excepted from sovereign immunity by the Act "for the most part concern commercial activities by a foreign state having a nexus with the United States." *Verlinden B. V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1293 (S.D.N.Y. 1980); *Carey v. National Oil Corp.,* 453 F.Supp. 1097, 1101 (S.D.N.Y.1978) (requirements of minimum jurisdictional contacts and adequate notice embodied in the Act), *affirmed,* 592 F.2d 673, 676 (2d Cir. 1979).

The substantive element of sovereign immunity and the procedural element of personal jurisdiction are closely related under the FSIA. As explained by Judge Tenney in *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 851 (S.D.N.Y.1978):

> The Act's central feature is its specification of categories of actions for which foreign states are not entitled to claim the sovereign immunity from American court jurisdiction otherwise granted to such states. These exceptions are contained not in the sections of the Act which describe the grounds on which jurisdiction may be obtained, however, but are phrased as substantive acts for which foreign states may be found liable by American courts. This effects an identity between substance and procedure in

the Act which means that a court faced with a claim of immunity from jurisdiction must engage ultimately in a close examination of the underlying cause of action in order to decide whether the plaintiff may obtain jurisdiction over the defendant.

As a threshold matter, we note that Iran is a "foreign state" within the meaning of the Act, 28 U.S.C. § 1603(a), and that the other defendants, Iranian–controlled corporations, constitute "agencies or instrumentalities of a foreign state" under § 1603(b).

Plaintiff asserts four discrete bases for personal jurisdiction over the Iranian defendants in this case:

(1) A waiver of sovereign immunity clause in the Treaty of Amity, Economic Relations and Consular Rights Between the United States of America and Iran, signed August 8, 1955, 8 U.S.T. 899, T.I. A.S. 3853 ("Treaty of Amity"), provides implied consent to jurisdiction.

(2) The arbitration clauses in many of the construction and supply contracts which form the basis of Counts I and II of the complaint evidence waiver of sovereign immunity and consent to jurisdiction of United States courts.

(3) By virtue of the Iranian defendants' "presence" in the United States and their "doing business" generally in this country, personal jurisdiction may be asserted over them.

(4) Significant and substantial commercial contacts by the defendants with the United States forum (as opposed to the Illinois forum) relating to the instant transactions support jurisdiction.

We reject the first three theories of personal jurisdiction. We will discuss them in turn.

---

**3.** 28 U.S.C. § 1330, "Actions against foreign states," provides:

> (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

> (b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

> (c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title. Added Pub.L. 94–583 § 2(a), Oct. 21, 1976, 90 Stat. 2891.

*United States–Iran Treaty of Amity*

Plaintiff argues initially that this court need not engage in a minimum contacts analysis because the Iranian defendants' waiver of sovereign immunity in the Treaty of Amity constitutes implied consent to jurisdiction. Article XI, Section 4 of the Treaty provides:

No enterprise of either High Contracting Party, including corporations, associations and government agencies and instrumentalities, which is publically owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

8 U.S.T. 909.

The FSIA, 28 U.S.C. § 1604, in turn, provides:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

*See also* 28 U.S.C. § 1605(a)(1).[4]

■ A few preliminary observations on the scope and import of the waiver clause in the United States–Iranian Treaty of Amity are in order. First, there is substantial doubt whether the waiver of immunity clause covers acts of the Islamic Republic of Iran (and its instrumentalities) within its own borders. The complaint alleges that the acts of conversion and expropriation occurred in Iran. Complaint at ¶¶ 65–69, 75–77. Judicial opinions and comments of American treaty draftsmen interpreting

identical waiver clauses in thirteen other Friendship, Commerce and Navigation Treaties have concluded that these clauses were designed to put American companies in an equal competitive position with foreign state–owned enterprises expanding their operation into the United States–not to transform U. S. courts into international courts of claims for extra–territorial suits against these foreign enterprises. *See Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 357–358 (2d Cir. 1964); Brief of the United States as *Amicus Curiae, Electronic Data Systems Corp. v. The Social Security Organization of the Government of Iran et al.,* 79–7696 (2d Cir. October 1979), pp. 12, 19 (discussing US–Iran Treaty of Amity), filed as Appendix to Defendant Islamic Republic of Iran's Memorandum on Personal Jurisdiction ("Appendix"); Memorandum from the Legal Advisor of the Department of State to the Department of Justice, "Sovereign Immunity Clauses in Friendship, Commerce and Navigation Treaties," August 13, 1957, p. 2, filed as Exhibit A to Defendant's Appendix; Declassified Annotations on the Draft Treaty of Friendship, Commerce and Navigation between the United States of America and the Republic of Portugal, April 1949 (excerpt), pp. 33 *et seq.,* filed as Exhibit D to Defendant's Appendix. *See generally,* Setser, "The Immunity Waiver of State–Controlled Business Enterprises in United States Commercial Treaties," Proceedings of Am. Society of Int'l.L. 89 (1961); Walker, "Modern Treaties of Friendship, Commerce and Navigation," 42 Minn.L.Rev. 805, 806 *et seq.* (1958).

Second, courts have differed over whether the United States–Iranian Treaty of Amity waives sovereign immunity from pre-judgment attachment. *Compare e. g., American International Group, Inc. v. Islamic Republic of Iran,* 493 F.Supp. 522, 525–526 (D.D.C.1980) (discussing court's

---

4. 28 U.S.C. § 1605(a)(1) states:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case–

(1) in which the foreign state has waived its immunity either explicitly or by implication,

notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

earlier opinion of December 19, 1979); *Behring International v. Imperial Iranian Air Force*, 475 F.Supp. 383, 393–395 (D.N.J. 1979) (finding an implicit waiver from pre-judgment attachment based on "execution of judgment" and "or other liability" clauses of Article XI, Section 4 of the Treaty) *with New England Merchants National Bank v. Iran Power Generation and Transmission Co.*, 502 F.Supp. 120, 126–127 (S.D.N.Y. 1980); *E–Systems, Inc. v. Islamic Republic of Iran*, 491 F.Supp. 1294, 1299–1301 (N.D.Tex.1980) (finding no waiver from prejudgment attachment). Although a few courts have discounted its significance, *see e. g., Behring International v. Imperial Iranian Air Force, supra*, 475 F.Supp. at 392 *et seq.*, Section 1610(d) of the FSIA provides that a foreign state must *explicitly* waive its immunity from prejudgment attachment.

Third, the waiver provision contained in the Treaty of Amity does not necessarily confer personal jurisdiction. Significantly, at the time the Treaty was signed the law required a plaintiff to demonstrate an independent basis for personal jurisdiction aside from any waiver of sovereign immunity. *See e. g., Petrol Shipping Corp. v. Kingdom of Greece, et al.*, 360 F.2d 103, 106 (2d Cir. 1965) (only after jurisdiction is acquired may sovereign immunity defense be raised), *cert. denied*, 385 U.S. 931, 87 S.Ct. 291, 17 L.Ed.2d 213. Under these circumstances there is no basis for assuming that the contracting parties to the Treaty, by their silence, intended to consent to personal jurisdiction. Because the Treaty of Amity does not cover personal jurisdiction, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), must control for purposes of establishing jurisdiction. H.R.Rep. No.94–1487, 94th Cong., 2d Sess. 18, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6616 (where a treaty is silent, FSIA controls). Under this provision, the minimum contacts requirements of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), must be satisfied before this court can exercise jurisdiction over the Iranian defendants. *Id.* at 6612.

Aside from these questions of interpretation, there is a more fundamental objection to the exercise of personal jurisdiction on the basis of a waiver of sovereign immunity. In light of *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and other *International Shoe* descendants, we believe the fiction of implied consent cannot obviate the need for establishing minimum contacts with a forum.

Plaintiff argues otherwise:

Minimum contacts between non–resident defendants and a forum have long been regarded as at best a secondary consideration where jurisdiction could be upheld on the basis of implied consent to suit in the particular forum. *Hess v. Pawlowski [Pawloski]*, 274 U.S. 352 [47 S.Ct. 632, 71 L.Ed. 1091] (1927).

Plaintiff's Supplemental Memorandum in Support of Attachment, p. 7. We reject this reasoning as irreconcilable with the aforementioned personal jurisdiction decisions and the Due Process Clause.

*Shaffer v. Heitner, supra*, perhaps more than any other case, refutes plaintiff's argument. That decision made clear that *International Shoe* minimum contacts analysis governs all exercises of personal jurisdiction. 433 U.S. at 204, 212, 97 S.Ct. at 2579–2580, 2584 (". . . all assertions of state–court jurisdiction must be evaluated according to the standards set forth in *International Shoe and its progeny*"), 216, 97 S.Ct. 2586 (opinion of the Court); at 217, 97 S.Ct. at 2586–2587 (Powell, J., concurring); at 220, 97 S.Ct. at 2588 ("The primary teaching . . . of today's decision is that a State, in seeking to assert jurisdiction over a person located outside its borders, may only do so on the basis of minimum contacts among the parties, the contested transaction, and the forum State."), 227, 97 S.Ct. 2591–2592 (Brennan, J., concurring in part,

dissenting in part).[5] *See also* The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 160 (1977) (". . . Shaffer removes any doubt that *International Shoe* governs all exercises of jurisdiction . . . .). In addition, Justice Marshall, writing for the majority, declared that decisions like *Hess v. Pawloski, supra,* implying consent to jurisdiction from certain conduct or admissions, rest upon a "legal fiction":

> The advent of automobiles, with the concomitant increase in the incidence of individuals causing injury in States where they are not subject to in personam actions under *Pennoyer* [*Pennoyer v. Neff,* 5 Otto 714, 95 U.S. 714, 24 L.Ed. 565 (1878)], required further modification of the territorial limits on jurisdictional power. This modification . . . was accomplished by use of a legal fiction that left the conceptual structure established in *Pennoyer* theoretically unaltered. The fiction used was that of the out-of-state motorist, who it was assumed could be excluded altogether from a State's highways, had by using those highways appointed a designated state official as his agent to accept process. See *Hess v. Pawloski,* 274 U.S. 352 [47 S.Ct. 632, 71 L.Ed. 1091] (1927).

433 U.S. at 202, 97 S.Ct. at 2578–2579 (citation omitted). *Shaffer,* of course, overruled what remained of *Pennoyer* and its "conceptual structure" for establishing jurisdiction. 433 U.S. at 212 and n. 39, 97 S.Ct. at 2584 and n. 39. Justice Marshall's reasoning places in doubt the constitutionality of all 'consent to jurisdiction' provisions, especially those which are implicit. *See generally* 433 U.S. at 206–217, 97 S.Ct. at 2580–2587 and the illustration at 216, 97 S.Ct. at

2586: "[I]t strains reason . . . to suggest that anyone buying securities in a corporation formed in Delaware 'impliedly consents' to subject himself to Delaware's . . . jurisdiction on any cause of action." *Compare* 91 Harv.L.Rev. at 161 (questioning validity of statutes deeming acceptance of corporate directorship to be consent to jurisdiction (in the state of incorporation) after *Shaffer* ).[6]

The implied consent to jurisdiction concept as applied to the United States–Iranian Treaty of Amity waiver clause is no less a fiction. It is surely a leap in logic to suggest that because Iran signed a friendship treaty with the United States some 25 years ago waiving sovereign immunity for certain limited acts[7] that it impliedly consented to personal jurisdiction over any future claim brought in the United States irrespective of any contacts in or even with that forum. We are not the first court to question the use of waiver as a substitute for due process fairness in the exercise of jurisdiction over foreign sovereigns. Judge Weinfeld recognized the overbreadth of the FSIA waiver provision:

> If the language of the Act is applied literally, the result is that a foreign sovereign which has waived its immunity can be subjected to the personal jurisdiction of the United States courts *regardless of the nature or quality of its contacts with this country.*[8]

*Verlinden B. V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1302 (S.D.N.Y.1980) (emphasis added). He regarded this approach as a "problem" which "Congress did not anticipate" (*id.* at n. 88):

---

5. Justice Brennan observed, "Once we have rejected the jurisdictional framework created in *Pennoyer v. Neff,* I see no reason to rest jurisdiction on a fictional outgrowth of that system such as the existence of a consent statute, express or implied." 433 U.S. at 227, 97 S.Ct. at 2592.

6. *See also,* R. Leflar, *American Conflicts Law* § 24A, at 43 (3d ed. 1977):

> The [*Shaffer* ] decision proves beyond question that old jurisdictional dogma is not sacred. If century-old law on in rem jurisdic-

tion can be changed, so can other rules that are believed to operate unfairly.

7. Some courts have decided, for example, that prejudgment attachment is not covered by the Treaty's waiver of sovereign immunity provision. See discussion at pp. 984–985 *supra.*

8. Remarkably, plaintiff cites this exact language in the *Verlinden* decision, out of context, and with no indication that Judge Weinfeld *criticized* this "literalist" approach. Plaintiff's Supplemental Memorandum at p. 6.

On the one hand the legislative history indicates that Congress intended the courts to exercise personal jurisdiction only over foreign states having sufficient contacts with the United States. *See House Report, supra* note 7, at 13–14; *reprinted* [1976 U.S.Code Cong. & Admin. News 6604] at 6612. On the other hand, the statute it wrote permits the assertion of jurisdiction either when there are sufficient contacts (i. e., when one of the commercial activity exceptions [of § 1605(a)(2)] have been met) *or* when there has been a waiver.

*Id.* at n. 88 (emphasis in the original). Although not addressing the precise waiver issue presented here, Judge Weinfeld concluded: "Because the Act's waiver provision is written as broadly as it is, it is incumbent upon the Court to narrow that provision's scope." *Id.* at 1302 (Dutch choice of law clause in Nigerian government–Dutch corporation contract does not result in Nigeria's implicit waiver of immunity to jurisdiction of U.S. courts). Other courts have also been troubled by congressional ambivalence in the application of due process principles to foreign state personal jurisdiction. *See e. g., Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1060 (E.D.N.Y.1979) (Weinstein, J.):

> Although the waiver provision, as a rough analogy to consent, apparently incorporates that traditional basis of jurisdiction, the draftsmen of the Immunities Act concentrated on the bases incorporated in the newer *forms of long–arm jurisdiction.* These modern long–arm statutes require a link between the "contact" with the local jurisdiction which is the basis for in personam jurisdiction in the suit and the facts upon which the particular cause of action–in federal parlance the claim for relief–is based.

It is to be noted that the "primary" purpose of the Foreign Sovereign Immunities Act of 1976 was to strip foreign states of their immunity from suit when they engaged in private commercial conduct,[9] thereby placing them on the *same* footing as nongovernmental enterprises. *Cf. Carey v. National Oil Corporation, supra,* 453 F.Supp. at 1102. *See also Behring International v. Imperial Iranian Air Force, supra,* 475 F.Supp. at 395–396 (U. S.–Iranian Treaty of Amity treats foreign state like "any private person" in the other's courts). Eliminating the need to establish personal jurisdiction over those governmental enterprises, however, through the fiction of consent puts them in a far worse position.

For the foregoing reasons, we will not exercise personal jurisdiction over the Iranian defendants based on the waiver of sovereign immunity clause in the Treaty of Amity.

*Arbitration Clauses*

■ Plaintiff argues, in addition, that the arbitration clauses in the contracts with the Iranians provide implicit consent to jurisdiction in the United States Courts. We requested plaintiff to file copies of these clauses. Having now reviewed them, we categorically reject the arbitration clauses as a basis for jurisdiction.

None of the arbitration clauses in these contracts contain U.S. choice of law or choice of forum provisions. In fact, those contracts which address the question, stipulate that *Iranian law* or the *Iranian courts* shall resolve disputes in the event of the breakdown of informal arbitration. We agree with Judge Weinfeld's precise holding in *Verlinden B. V. v. Central Bank of Nigeria, supra,* that the presence of third–party nation choice of law and forum clauses does not in any sense implicitly consent to United States jurisdiction:

> Plaintiff's view, if adopted, would presage a vast increase in the jurisdiction of federal courts in matters involving sensitive foreign relations: whenever a foreign sovereign had contracted with a private party anywhere in the world, and

---

**9.** H.R.Rep.No.1487, 94th Cong., 2d Sess. 7, *reprinted at* [1976] U.S.Code Cong. & Admin. News, pp. 6604, 6605; Kahale & Vega, "Immunity and Jurisdiction: Toward a Uniform Body of Law in Actions Against Foreign States," 18 Columbia J. of Transnational Law 211, 212, 218–19 and note 40 (1979).

chose to be governed by the laws or answer in the forum of any country other than its own, it would expose itself to personal liability in the courts of the United States. Verlinden [plaintiff] and Nigeria [defendant bank] could scarcely have foreseen this *untoward result* when they signed the contract; and it is unlikely that Congress could have intended it.

488 F.Supp. at 1302 (emphasis added).

*The Commercial Activity Exceptions to Sovereign Immunity Under the FSIA, 28 U.S.C. § 1605(a)(2), and the "Doing Business" Concept*

■ The House report accompanying the FSIA describes § 1330(b), the personal jurisdictional component of the Act, and § 1605(a)(2), the commercial activities exceptions to sovereign immunity, as creating a "federal long–arm statute over foreign states." H.R.Rep.No.94–1487, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6612 ("House Report"). The Act's long–arm statute was patterned after the District of Columbia's long–arm statute, the legislative history indicating that the *International Shoe* requirements of minimum contacts and adequate notice were embodied in the Act. *Id. See also Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion De Costa Rica*, 614 F.2d 1247, 1255 (9th Cir. 1980) ("[p]ersonal jurisdiction under the Act requires satisfaction of minimum contacts standard"); *Verlinden B. V. v. Central Bank of Nigeria, supra*, 488 F.Supp. at 1293 (discussing § 1605 of FSIA); *Carey v. National Oil Corp., supra*, 453 F.Supp. at 1101. However, the FSIA's bases of jurisdiction are "less comprehensive than those found in the usual jurisdictional statutes of the states and the District of Columbia." *Harris v. VAO Intourist, Moscow, supra*, 481 F.Supp. at 1059. Notwithstanding plaintiff's arguments to the contrary, the Act has clearly rejected the "doing business" or "mere presence in the forum" concept for the exercise of jurisdiction. *Verlinden B. V. v. Central Bank of Nigeria, supra*, 488 F.Supp. at 1295; *Harris v. VAO Intourist, Moscow, supra*, 481 F.Supp. at 1059–1060. Oblique

contacts with the United States wholly unrelated to the instant suit may not be considered. We will therefore not allow plaintiff to pursue any discovery directed to the Iranian defendants' general commercial activities in the United States.

The three "commercial activity" situations in which personal jurisdiction may be exercised over a foreign state and its instrumentalities, 28 U.S.C. § 1605(a)(2), remain to be considered. The provision states in relevant part:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case–in which the action is based

–upon a commercial activity carried on in the United States by the foreign state; or

–upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or

–upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

Before analyzing these independent bases, we note that the FSIA speaks only in terms of contacts with the United States, not any particular state or subdivision. 28 U.S.C. §§ 1605(a)(2), 1605(a)(3). *See also East Europe Domestic International Sales Corp. v. Terra*, 467 F.Supp. 383, 387 *et seq.* (S.D.N.Y. 1979).

*Commercial Activity Carried on in the United States*

To prevail under this standard, plaintiff must identify "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The activity must involve "substantial contact with the United States," § 1603(e), and the cause of action must be "based upon" that commercial activity. *See* 28 U.S.C. § 1605(a)(2). Congress never intended to bestow jurisdiction under the FSIA where the only contact with this country is the U.S. citizenship or residency of the plaintiff.

House Report at 17, *reprinted at* 6616. *Accord, Verlinden B. V. v. Central Bank of Nigeria, supra,* 488 F.Supp. at 1296 ("[t]he crucial question is whether [the activity] involves 'substantial contact' with the United States ..."). Ultimately, it is "for the courts to determine whether a particular commercial activity has been performed in whole or part in the United States." House Report at 17, *reprinted at* U.S.Code Cong. & Admin.News 1976, p. 6616.

Political acts by a foreign state obviously do not constitute commercial undertakings. *See e. g., Carey v. National Oil Corp., supra,* 453 F.Supp. at 1102 (cutback on oil production by Libya during Middle East tensions). The commercial activity providing the jurisdictional basis must involve more than the mere transmission of telex messages between a foreign state and the United States. *See East European Domestic International Sales Corp. v. Terra, supra.* Numerous visits by agents of a foreign instrumentality, on the other hand, to review and "active[ly]" inspect the progress made on a contract has been held to constitute sufficient minimum contacts. *Electronic Data Systems Corp. v. Social Security Organization of the Government of Iran,* CA3–79–218–F (N.D.Tex. June 21, 1979), Slip Op. at 5–6. These cases, of course, are merely illustrative of the contacts questions under this first branch of § 1605(a)(2).

*Act Performed in the United States in Connection with a Commercial Activity of the Foreign State Elsewhere*

This part of § 1605(a)(2) "looks to conduct of the foreign state in the United States which relates either to a regular course of commercial conduct elsewhere or to a particular commercial transaction concluded or carried out in part elsewhere." House Report at 19, *reprinted at* U.S.Code Cong. & Admin.News 1976, p. 6617. There must, however, be some "specific" act performed *in* the United States by the foreign entity in order to invoke jurisdiction. *Id.* at 19, *reprinted at* 6618; *East Europe Domestic International Sales Corp. v. Terra, supra,* 467 F.Supp. at 388. The acts covered by this subsection are limited to those which

independently "form the basis of a cause of action." House Report at 19, *reprinted at* U.S.Code Cong. & Admin.News 1976, p. 6618. Thus, an act by a foreign state in the United States that violates United States securities laws or the wrongful discharge of a foreign state employee employed in the United States in connection with overseas commercial activity satisfies the requirements. *Id.* at 19, *reprinted at* 6617.

*An Act Outside the United States Which Causes a Direct Effect in the United States*

Although this section has been principally applied to tortious conduct, the legislative history of the FSIA indicates that it has a broader scope. Congress adopted by reference the principles of § 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965), which cover conduct "whether tortious or otherwise." House Report at 19, *reprinted at* 6618. Courts have applied this exception only where there has been a *"substantial* effect within the territory" as a result of *"direct* and *foreseeable"* conduct outside the territory." *Verlinden B. V. v. Central Bank of Nigeria, supra,* 488 F.Supp. at 1298 (emphasis in original) (refusing to apply exception in commercial banking context); *Harris v. VAO Intourist, Moscow, supra,* 481 F.Supp. at 1062–1063.

The direct effect intended by the FSIA "is one which has no intervening element, but rather flows in a straight line without deviation or interruption." *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C. 1978), *affirmed without opinion,* 607 F.2d 494 (D.C.Cir.1979). For example, in *Carey v. National Oil Corp., supra,* the leading case discussing the "direct effect" standard, breaches of petroleum contracts and excessive payment charges by a Libyan–owned corporation against the Bahamian subsidiaries of an American parent corporation were held not to have a sufficient direct effect in the United States. 453 F.Supp. at 1101. The court conceded that these subsidiaries may have been "merely ... conduits to supply [the parent company]" and noted that the 1974 Libyan oil embargo was "designed to have a direct effect of a sort

on the United States," but still refused to find the requisite minimum contacts. *Id.* at 1101. The Court of Appeals affirmed.[10] Similarly, mere injurious consequences within the United States based on an act or omission outside the country have not resulted in jurisdiction over foreign defendants. *Upton v. Empire of Iran, supra,* (collapse of Iranian airport terminal roof causing deaths of several Americans does not have "direct effects" in the United States).

■ In summary, we do not exercise personal jurisdiction over the Iranian defendants based on the waiver of sovereign immunity provision in the United States–Iranian Treaty of Amity or the arbitration clauses in the contracts pleaded in this action. We also find that the FSIA long–arm provisions do not provide for jurisdiction based on defendants' mere presence in the United States. Jurisdiction may, however, be grounded upon the Iranian defendants' contacts with the United States relating to the instant transactions and claims, provided that the threshold requirements of 28 U.S.C. § 1605(a)(2) are satisfied. Discovery may proceed along these lines.

We reserve ruling on the dismissal of the suit or the denial of the prejudgment attachment motion, based on lack of proper jurisdiction over the parties, until the factual record is completed.

---

**10.** 592 F.2d 673 (2d Cir. 1979). The Court of Appeals applied the same reasoning:

> PETCO [subsidiary of plaintiff] is a Bahamian corporation. Though a subsidiary of NEPCO [plaintiff], it was a separate corporate entity, and we will not here "pierce the corporate veil" in favor of those who created that veil. The cancellation of the contracts between NOC [defendant] and PETCO, and the overcharge on the charters, had a direct effect on PETCO as a party to those contracts, but not in the United States. Similarly, while there was an admitted effect on NEPCO, an American company, that effect can only be deemed indirect, through NEPCO's relations with PETCO and Antco [subsidiary of plaintiff NEPCO], whose dealings with NOC were entirely outside the United States. . . .
> The appellants claim that the Libyan government and NOC were aware that the refineries in the Bahamas were being used primarily to channel oil into the United States. Appellants also contend that the Libyan oil embargo was expressly aimed at affecting the United States. Even if these allegations are true, they do not fulfill the "minimum contacts" requirement of *International Shoe*, and thus cannot reach the level of "direct" effects described in the statute.

592 F.2d at 676–677 (citation omitted).