# Presidential Authority to Permit the Withdrawal of Iranian Assets Now in the Federal Reserve Bank

In order to allow Iran to withdraw its assets in the Federal Reserve Bank, the President has the power, under the International Emergency Economic Powers Act (IEEPA), to nullify existing attachments licensed under the Iranian Assets Control Regulations. Since in consenting to attachments against the blocked Iranian assets the Government reserved the right to revoke its consent at any time, their nullification does not constitute a compensable taking of private property.

The Federal Reserve Bank may release Iranian assets which have been attached but are not yet subject to a licensed final judgment, in reliance on the Presidents' action under the IEEPA, without applying to the court to vacate its attachment orders. The considerations which ordinarily mandate compliance with court orders would not justify a contempt citation where the conduct in question has been clearly mandated by supervening executive action, where compliance would defeat the President's exercise of his emergency power under the IEEPA, and where the IEEPA itself provides an express exception to contempt liability for compliance with an order issued under its authority.

Where Congress has immunized good faith compliance with a presidential order issued under the IEEPA, the Federal Reserve Bank would not be held liable to disappointed attachment creditors even if the presidential orders nullifying the attachment orders were later held unlawful. Nor is there any basis, in the Constitution or otherwise, on which creditors whose attachments were nullified would be likely to recover against the United States itself.

October 8, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your request for our opinion whether the President has authority to permit the Central Bank of Iran and the Bank Markazi to withdraw the blocked assets they now have on deposit with the Federal Reserve Bank (FRB) notwithstanding the outstanding orders of attachment entered against such assets. You have also asked whether it is necessary to approach the courts that have entered the orders of attachment and obtain orders of dissolution before transferring the funds. We have concluded that the President has the authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* (Supp. I 1977), to return those assets by revoking the existing licenses for attachments against them and by licensing withdrawals. It is our view that such action is sufficient as a legal matter to authorize the return of those assets. Moreover, it is our opinion that the Federal Reserve Bank, relying upon that authority, may release the assets without applying to the court to vacate the

273

attachment orders. We believe it would be an abuse of discretion for a court to use the contempt power to penalize noncompliance with an attachment order that has been rendered unenforceable by the President's order. Finally, Congress has immunized good faith compliance with emergency orders issued under IEEPA; therefore, it is our opinion that the Federal Reserve Bank could not be held liable to the attachment creditors for damages even if a court should later determine that the President's order was beyond the scope of his power under IEEPA. Similarly, we have found no basis for any action for damages by the attachment creditors against the United States.

### I. Presidential Authority to Nullify Outstanding Attachments

Under IEEPA, the President has broad powers to issue orders blocking or releasing Iranian assets.[1] Pursuant to that power, the President issued Executive Order No. 12,170 on November 14, 1979, blocking all property subject to the jurisdiction of the United States in which the government of Iran or any of its instrumentalities had an interest. 3 C.F.R. 457 (1979). The order also delegated to the Secretary of the Treasury presidential authority under IEEPA to implement the blocking order. On the same day, the Treasury Department issued the first of its Iranian Assets Control Regulations (IACR), which provided in part (31 C.F.R. § 535.203(e)):

> Unless licensed or authorized pursuant to this part any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the effective date there existed an interest of Iran.

On November 19, 1979, § 535.805 was added, providing that any licenses or authorizations "may be amended, modified or revoked at any time." A limited modification to the general ban on unlicensed judicial proceedings was made subsequently on November 23, 1979, with the adoption of § 535.504, which authorized judicial proceedings but continued the ban on judgments and payments from blocked accounts. And finally, on December 18, 1979, an interpretive rule was added to clarify the permissible scope of judicial action (§ 535.418 (1980)):

---

[1] The IEEPA's principal operative provision, § 1702(a)(1), provides that the President may:
    (A) investigate, regulate or prohibit—
        (i) any transactions in foreign exchange,
        (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
        (iii) the importing or exporting of currency or securities; and
    (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest. . . .

> The general authorization for judicial proceedings contained in § 535.504(a) includes pre-judgment attachment. However, § 535.504(a) does not authorize payment or delivery of any blocked property to any court, marshal, sheriff, or similar entity, and any such transfer or blocked property is prohibited without a specific license. It would not be consistent with licensing policy to issue such a license.

All of the attachment orders entered against the Iranian assets held by the Federal Reserve Bank exist pursuant to Treasury's general license. In order to effect Iran's withdrawal of the assets in the FRB, we believe the President has the power to nullify the licensed attachments by revoking the existing general licenses for attachments.

While there is no case law addressing the President's power under IEEPA to nullify attachments issued under a licensing scheme such as the one presently in effect under the IACR, we believe that *Orvis* v. *Brownell*, 345 U.S. 183 (1953), provides strong support for the general principle that the President may, under IEEPA, condition his consent to the creation of property interests in blocked property and, by invoking those conditions, nullify such property rights. In *Orvis*, claimants in a New York court attached a credit, previously frozen by executive order, which had been owed to Japanese nationals by a stock association. The claimants obtained a judgment and, as required by regulation, applied for a federal license to permit the stock association to pay over the amount in judgment. The application was denied, and the Custodian vested the credit and received payment from the stock association. The judgment creditors, asserting that they had a right to the funds, filed an action under § 9(a) of the Trading with the Enemy Act, after the Custodian denied their notice of claim to those funds.

The Supreme Court, in rejecting the judgment creditors' § 9(a) claim, noted that the government had consented to the unlicensed attachment of the funds for the limited purpose of determining the rights and liabilities between the creditors and the enemy debtors.[2] The Court

---

[2] Prior to the attachment in *Orvis*, Treasury had issued a general ruling that any unlicensed transfers, including attachments, were null and void. Department of Treasury Ruling No. 12, § 131.12, 7 Fed. Reg. 2991 (1942). Paragraph 4 of the ruling, however, recognized unlicensed transfers, including attachments, as valid and enforceable for the purpose of determining the rights and liabilities of the parties to the action. One day after the issuance of the ruling, Treasury announced its position with respect to unlicensed attachments in an *amicus curiae* brief in the New York Court of Appeals, stating that unlicensed attachments were desirable to clarify the rights and liabilities of private parties. Brief of the United States as *amicus curiae* at 52, 53 *Commission for Polish Relief* v. *Banca Nationala a Rumaniei,* 288 N.Y. 332, 43 N.E. 2d 345 (1942), *quoted in Zittman* v. *McGrath,* 341 U.S. 446, 454–57 (1951) (*Zittman I*). Nine years later in *Zittman I,* the Court relied on Treasury's administrative practice and interpretation of Ruling No. 12 to deny Treasury's request that an attachment obtained in state court against blocked German bank accounts be declared null and void and decided that the attachment was valid between the private parties to the action. Accordingly, the Court held that an order of the Custodian vesting the "right, title and interest" of the German banks placed the Custodian in the shoes of the German banks and, therefore, subject to the attachment. In a companion case, *Zittman* v.
Continued

275

held, nonetheless, that the government's permission to attach the credit in state court proceedings created no property interest that could be asserted against the government because the government had reserved the right to withhold licenses for judgment. The Court reasoned that the government's initial consent to proceed with state court attachments

> did not extend so far as to recognize them as effecting a transfer. To so interpret it *would ignore the express conditions on which the consent was extended.* Realistically, these reservations deprive the assent of much substance; but that should have been apparent on its face to those who chose to litigate. The opportunity to settle their accounts with the enemy debtor was all that the permission to attach granted.

*Id.* at 187 (emphasis added).

Three important principles emerge from a careful analysis of *Orvis.* First, the President has the power under IEEPA [3] to prevent the creation of property interests in blocked alien property. Second, this power includes the power to reserve the right to withdraw any consent he may give to the creation of property rights or to condition the exercise of any property right created pursuant to his consent. Third, this power to reserve the right to withdraw consent or condition the exercise of property rights is paramount and supersedes any rights creditors may acquire under state law.

Application of these principles to the release of Iranian assets held by the FRB leads to the conclusion that the President has the power under IEEPA to nullify the attachments against those assets. Treasury, as the President's delegee, has consented to attachments against the blocked Iranian assets. 31 C.F.R. § 535.504 and 535.418. In giving its consent, Treasury reserved two crucial rights. Treasury withheld its consent to

---

*McGrath,* 341 U.S. 471 (1951) (*Zittman II*), the Court held that the Custodian's order, without such restrictive language, directing that certain German bank accounts previously attached by creditors be turned over was valid. Since the Custodian had sought only possession of the funds and, unlike *Zittman I,* had not asked for a judgment declaring the attachments to be invalid, the Court addressed only the question whether the Custodian had the power to possess and administer those funds. The Court expressly reserved the question whether the state court judgments and attachments would have any conclusive effect on the final disposition of the accounts. *Id.* at 474. That question was decided in the negative two years later in *Orvis.*

[3] The case law under the Trading with the Enemy Act as amended in 1941, is fully applicable to our analysis of the President's authority under its successor statute, IEEPA. As the legislative history of IEEPA notes, the "grant of authorities [in IEEPA] basically parallels section 5(b) of the Trading with the Enemy Act." H. R. Rep. No. 459, 95th Cong., 1st Sess. at 14-15 (1977). Indeed, because the blocking order in *Orvis* was issued prior to the 1941 amendments to the Trading with the Enemy Act, which added *inter alia* the powers to nullify or void any interest in alien property, it could be strongly argued that the President's powers to nullify or void the attachments against the locked assets are even greater than the powers of the President when the *Orvis* blocking order was issued. Not only does the President have the power recognized in *Orvis* to condition the creation of property interests and to nullify said interests by invoking the stated conditions; he arguably also has the power to nullify or void any interest in blocked property even in the absence of any stated conditions or reservations. The exercise of that power, however, may raise a substantial "takings" question under the Fifth Amendment.

276

judgment, a reservation which *Orvis* regarded as permitting the government to nullify any attachments vis-a-vis itself. Treasury also reserved the right to revoke its consent to attach at any time. 31 C.F.R. § 535.805.[4] Thus, the government reserved not only the right to nullify attachments vis-a-vis the government, but also the right to nullify them totally.[5] This latter reservation was critical in order to ensure that the President would have maximum flexibility in negotiating with Iran for the release of the hostages. Because the license to attach was subject to these reservations, the attaching creditors in initiating attachments proceedings assumed the risk that the license to attach would be withdrawn at any time. But, like the attachment creditors in *Orvis,* that risk "should have been apparent on its face to those who chose to litigate." 345 U.S. at 187.

## II. Judicial Dissolution of Attachment Orders

We have concluded that the President has authority under IEEPA to prevent the continuing assertion of interests in Iranian property through the provisional remedy of attachment. The President may exercise that authority by issuing an order prescribing that attachments shall create no interests in Iranian property. Moreover, with respect to any pending litigation involving Iranian property already subject to attachment but not yet subject to a licensed final judgment, the President may provide (1) that the plaintiff shall no longer enjoy provisional rights in the property through attachment, and (2) that the garnishee may lawfully transfer the property notwithstanding the plaintiff's attempt to secure it pending final judgment.

We now come to a procedural issue. If the President promulgates an order that (1) prevents the continued assertion of provisional rights through pending attachment orders and (2) authorizes garnishees to transfer Iranian property notwithstanding attempts to secure it through attachment, may garnishees assume that the President's action, if intended to do so, leaves them legally free to proceed directly with any authorized transfer, or must the garnishees apply first to the appropriate court or courts for orders formally vacating the attachments?

In ordinary circumstances, the general interest in preserving orderly judicial process would militate strongly in favor of the latter course. Procedures are provided by law for the modification or dissolution of court orders that stand in need of modification or dissolution because of

---

[4] In § 535.503, Treasury also reserved the right to exclude any person from the operation of any license or "to restrict the applicability [of any license] with respect to particular persons, transactions or property or classes thereof." Thus, Treasury reserved the right not only to revoke all licenses for attachments, but also to revoke selectively particular classes of licenses, *e.g.,* all general licenses for attachments against blocked assests held by the Federal Reserve Bank.

[5] Because of the reservation of the right to revoke these attachments, it is clear that they can be revoked under IEEPA without giving rise to a successful takings claim. *See. e.g.. Bridge Co.* v. *United States,* 105 U.S. 470 (1881); *United States* v. *Fuller,* 409 U.S. 488 (1973).

277

changed circumstances. Such procedures are available here. *See* N.Y. Civ. Prac. Law § 6223 (McKinney 1980). Ordinarily, these procedures provide an adequate means of obtaining relief from court orders that have been rendered void or unenforceable by a change in law. *See generally Pasadena City Board of Education* v. *Spangler*, 427 U.S. 424 (1976). Moreover, from a purely pragmatic standpoint, the use of these procedures in the present case would avoid the two risks presented by the alternative course—namely, (1) the risk that action in defiance of an undissolved attachment order will be regarded as contumacious and punishable as contempt, and (2) the risk the courts may yet hold the attachments lawful and the garnishee liable civilly for any damages suffered by the plaintiffs in consequence of violation of the attachment orders.[6] We will assess both of those risks below.

## A. Contempt

Our research to date has revealed only one decision by the Supreme Court dealing with the precise question presented here. *See Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421 (1855). In *Wheeling* the Court was asked to decide whether certain individuals should be held in contempt of an order that the Court itself had issued enjoining construction of a bridge over the Ohio River. Congress had subsequently enacted a statute declaring that this bridge was a lawful structure. The defendants, in reliance upon that Act, had proceeded with construction of the bridge without first applying to the Court for dissolution of the outstanding injunction. On the motion for contempt, the Court held that the Act of Congress was valid, that the previous injunction could not be enforced *in futuro*, that the motion for contempt was addressed to the discretion of the Court, and that under all the circumstances of the case the motion should be denied.

*Wheeling* does not hold that a court is powerless to punish defiance of an outstanding court order that has been rendered unenforceable by subsequent legislation. Indeed, the implication of the decision is to the contrary; and in that respect the decision is fully consistent with the settled rule, applicable in a different context, that the contempt power may be used to punish noncompliance with court orders that are erroneous or unlawful at the time they are issued. *See United States* v. *United Mine Workers of America*, 330 U.S. 258 (1947); *Walker* v. *City of Birmingham*, 388 U.S. 307 (1967). The Supreme Court has deemed this to be a necessary rule, given the need for a means of enforcing compliance with orderly process. The courts must be able to ensure that aggrieved litigants will appeal erroneous orders and not resort to self-

---

[6] It goes without saying that the executive's belief in the legality of any given executive action in response to the hostage crisis will not in itself prevent a court from deciding that the action is or was unlawful. If the underlying issue is justiciable and can be brought before a court with jurisdiction to decide it, there is always the risk that the court will rule against the Government.

help. Nonetheless, it is our view that *Wheeling* does stand for the proposition that the usual considerations supporting the rule of compliance do not justify a contempt citation where the conduct in question has been clearly mandated or authorized by subsequent legislation.[7] To be sure, the rule of compliance is not suspended by any and every change in circumstance, *see Spangler, supra;* but *Wheeling* suggests that it may be suspended by a clear and specific change in law.

In our opinion, the case at hand is an appealing case for application of the *Wheeling* rule. It is more appealing than was *Wheeling* itself. The builders of the bridge over the Ohio could have easily applied for dissolution of the injunction before resuming their work; yet the Court thought it inappropriate to hold them in contempt for boldly proceeding in the face of the outstanding order. This result cut against the traditional policy. The demand for compliance with orderly process has generally rested upon the assumption that existing procedures for the modification or correction of outstanding orders will be adequate to the exigencies of the case, that they will fully vindicate the rights in question, and that individuals can therefore be expected to comply with them without resorting to self-help. At the same time, the courts have recognized that in unusual cases the usual procedures may be inadequate; and in these cases the courts have been willing to countenance refractory conduct that would be held contumacious in other contexts. For example, where the rights of an individual would be wholly lost by complying with an outstanding order, his refusal to comply with it pending appeal is not punishable as contempt. There is no justification for requiring aggrieved litigants to comply with procedures that defeat the right at issue. *See United States* v. *Dickinson,* 465 F.2d 496, 511–12 (5th Cir. 1972), *citing Walker* v. *City of Birmingham, supra, Malloy* v. *Hogan,* 378 U.S. 1 (1964), *Gelbard* v. *United States,* 408 U.S. 41 (1972).

As we have said, Congress has given the President emergency power to nullify these attachments and to authorize transfer of the attached property. The President may attempt to use that power to resolve the hostage crisis. If, however, the government and the banks, to implement his order, must first pursue the usual judicial procedure for modification of outstanding attachments (a procedure involving motions, arguments, further litigation, and inevitable delay), then the President may be unable to use his power effectively to achieve the purpose authorized by Congress. If settlement of the crisis requires expedition and certainty, not uncertainty and the law's delay, we believe it would be an abuse of discretion for a court to use the contempt power to penalize noncompliance with an attachment order that has been ren-

[7] We do not believe our reliance on *Wheeling* is undercut by the evident distinction between supervening congressional action and supervening executive action taken under authority conferred by a preexisting statute (IEEPA). We believe that the assertion of supervening power under IEEPA would be entitled to as much respect by the judicial branch as supervening action by Congress.

dered unenforceable by lawful action under IEEPA. Continuing compliance with the order, followed by a motion for dissolution, argument, and further litigation, would defeat the emergency power that Congress has sought to create.

Finally, we observe that IEEPA itself provides that "[n]o person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this [Act], or any regulation, instruction, or direction issued under this [Act]." 50 U.S.C. § 1702(a)(3). Without expressing any view regarding the general question of the power of Congress to deprive the courts of a means of enforcing compliance with their own process, we are of the opinion that, in the face of this expression of congressional intent, the use of the contempt power to punish necessary and otherwise lawful action under IEEPA would be an abuse of discretion, and, therefore, unlikely. We have found one state court case, involving the Trading with the Enemy Act and the Federal Reserve Bank of New York, that supports this conclusion. *See Von Opel* v. *Von Opel,* 154 N.Y.S. 2d 616 (Sup. Ct. 1956). We have found no decision to the contrary.

*B. Civil Liability*

The second risk of proceeding in the face of outstanding attachment orders is the risk of civil liability. If the attached funds are released *before* the courts have determined that the President has power to nullify the attachments, the United States, the Federal Reserve Bank or both will almost certainly be asked to account to the creditors for any damages they sustain as a result of the release. If the courts ultimately decide (1) that IEEPA does not authorize the President to nullify these attachments and (2) that the attachments are otherwise valid under the Foreign Sovereign Immunities Act (FSIA), the question will arise whether the courts can go further and hold either the United States or the Federal Reserve Bank accountable to the attachment creditors for loss of the pre-judgment security.

We have several observations to make on this point. We shall discuss, first, the potential liability of the Federal Reserve Bank and, second, the potential liability of the United States.

1. Liability of Federal Reserve Bank

As a matter of practice, the Federal Reserve Bank of New York has not resisted the attempts of domestic creditors to attach foreign funds on deposit with that Bank. *See, e.g., National American Corp.* v. *Federal Republic of Nigeria,* 448 F. Supp. 622 (S.D.N.Y. 1978). Whether this practice is necessary, we do not know. It is obviously in harmony with the interests of domestic creditors, including the member banks of the

New York district. As you may know, these banks elect a majority of the directors of the Board of Directors of the Reserve Bank.

Under New York law the garnishee of a valid attachment order is accountable to the attachment creditor for any losses sustained by the creditor as a result of release of the attached property in violation of the order. *See Fitchburg Yarn Co.* v. *Wall & Co.,* 361 N.Y.S.2d 170 (App. Div. 1974). Whether this rule, or an analogous federal rule, will be enforced against the garnishee of a *federal* attachment order issued by a district court in New York under Rule 64 of the Rules of Civil Procedure, we cannot say. We have found no case on point. We can say, however, that if federal law (Rule 64) permits a third party to be subjected to garnishment in the first instance, it is a small thing to conclude that the third party may then be held to account for any violation of his duty as garnishee. The imposition of the duty implies a remedy for its breach. Again, we have not found a case on point; but we know of no reason why, as a general proposition, the garnishee of a federal attachment order issued under Rule 64 of the Rules of Civil Procedure cannot be subjected to civil liability for violation of the order.

What is the rule where the garnishee is a Federal Reserve Bank? Federal Reserve Banks are the tools of the Federal Reserve System, but they are corporate entities, they are owned by their shareholders, and they can "sue and be sued." The relevant statutes and the case law contain no hint that they enjoy general immunity from suit or liability for the wrongs they commit in the conduct of their business. Indeed, the relevant jurisdictional statute assumes that they can and will be subject (in federal court) to "suits of a civil nature at common law or in equity." *See* 12 U.S.C. § 632. This statute grants them a special immunity from prejudgment remedies in cases in which they themselves are parties defendant, but it does not provide them with immunity from execution on final judgment. Moreover, the shareholders of Federal Reserve Banks (the private "member" banks of the Federal Reserve System) are, by statute, responsible "individually" for all the "contracts, *debts* and *engagements*" of the Reserve Banks. *See* 12 U.S.C. § 502 (emphasis added). If a private national bank can be held civilly liable for wrongful release of attached funds, we find no clear indication that a Federal Reserve Bank can or should be accorded a different treatment.

We have expressed the view that a presidential order nullifying these attachments would be lawful. We think the Federal Reserve Bank could not incur liability to any attachment creditor for making a transfer that is authorized by a lawful presidential order. Moreover, there is

a serious question whether these attachments are valid in any event.[8] If the attachments are invalid, then as a matter of general law the garnishee can incur no liability to the attachment-creditors for transferring the attached funds. *See, e.g., United Collieries* v. *Martin,* 248 Ky. 808, 60 S.W. 2d 125 (1933); *Smith, Thorndike & Brown Co.* v. *Mutual Fire Ins. Co.,* 110 Wis. 602, 86 N.W. 241 (1901); *Henkel* v. *Bi-Metallic Bank,* 13 Colo. App. 410, 58 P. 336 (1899). Finally, even if the attachments are valid and even if they cannot be revoked under IEEPA, it is clear that the attachment creditors will sustain actual damage from a present transfer of the attached funds only if (1) their underlying claims are good on the merits, (2) their claims are not extinguished by a claims settlement,[9] (3) their claims can be reduced to final judgment, and (4) the relevant law, including FSIA, would permit those judgments to be paid out of the attached funds. With regard to the last point, we note that the present IEEPA regulations prevent any final judgment from being paid out of this property. Our view is that the creditors will be unable to demonstrate that they have been damaged by any transfer of the attached property unless they can show that this prohibition against the payment of final judgments could not lawfully be sustained in the future to bar the perfection (through execution on final judgment) of the mere provisional interests now being asserted in this property through attachment.

In all, there are so many contingencies standing in the way of garnishee liability in this case that it is difficult to make a realistic assessment of the actual risk. At the same time, given the amount of money in question, it is obvious that *any* risk of liability militates strongly in favor of a conservative approach to the transfer question, all other things being equal. This brings us to our final point.

Congress knew that any significant presidential action under IEEPA would upset existing legal relations, and give rise to claims and counter-

---

[8] Invoking a creative legal theory in his interpretation of FSIA, Judge Duffy has recently held that these attachments are not barred by FSIA and are otherwise valid. We disagree with the holding. FSIA provides that the assets of a foreign government are immune from prejudgment attachment unless the foreign government *explicitly* waives its immunity. 28 U.S.C. § 1610(d). This statutory immunity is subject to existing international agreements. 28 U.S.C. § 1609. One district court has held that while there has been no explicit waiver of immunity by Iran, the Treaty of Amity between Iran and the United States, which pre-dated FSIA, waived immunity from attachment with respect to military property. *Behring International, Inc.* v. *Imperial Iranian Air Force,* 475 F. Supp. 383 (D.N.J. 1979). FSIA provides that the assets of a foreign central bank are immune from attachment and execution unless the bank or its parent foreign government explicitly waives immunity. 28 U.S.C. § 1611(b)(1). As yet, there are no published opinions addressing the immunity of foreign central banks from attachment under FSIA. Two district courts have held, however, that FSIA renders the assets of the government of Iran immune from attachment because Iran has not waived immunity from attachment. *See Reading & Bates Corp.* v. *National Iranian Oil,* 478 F. Supp. 724 (S.D.N.Y. 1979) and *E-Systems, Inc.* v. *Islamic Republic of Iran,* 491 F. Supp. 1294, (N.D. Tex. 1980).

[9] We do not think that the acquisition of a provisional interest in foreign property through attachment immunizes the underlying claim from the government's power to settle that claim as part of an overall claims settlement. The provisional interest is only as good as the underlying claim. It dies if the claim dies. The power of the government to extinguish claims through settlement is clear. *See* Memorandum for the Attorney General dated September 16, 1980, "Presidential Authority to Settle the Iranian Crisis" [p. 248, *supra*].

claims among persons subject to the presidential order. Recognizing that these persons might be reluctant to rely on the order for fear of liability, Congress took care to preserve in IEEPA the exculpatory provision that had long been present in the Trading with the Enemy Act. We have referred to that provision above.

We know of no reason why this provision cannot be read for what it says. In our opinion, it would exculpate a garnishee (a mere stakeholder) who has relied in good faith upon a lawful presidential order authorizing release of attached funds under IEEPA. Would the exculpation be effective if the presidential action were ultimately held to be unlawful? The whole purpose of this provision is to resolve legal doubts and to encourage persons to rely upon emergency presidential action under IEEPA wherever they can do so in good faith. That purpose would be wholly frustrated if the provision were read to expose compliant individuals to liability for presidential mistakes. If individual liability were to depend in the end on the legality of what the President has done, no one with significant exposure would comply willingly with any presidential order until all the legal questions presented by the action had been definitively resolved. In our opinion, Congress has undertaken to prevent that impasse. Congress has immunized good faith compliance with emergency orders under IEEPA whether the orders are mistaken or not. We have found one district court opinion, *Garvan* v. *Marconi Wireless Tele. Co.,* 275 F. 486 (D.N.J. 1921), that supports this conclusion.

2. Liability of the United States

Either IEEPA authorizes nullification of these attachments, or it does not. If it authorizes nullification, there is a possibility that the United States may incur a constitutional liability as a result of nullification, *i.e.,* a liability imposed by the Fifth Amendment, which requires the United States to pay compensation when it "takes" private property for public use. That liability would provide a basis for an action by the creditors against the United States in the Court of Claims. We have expressed the view, however, that nullification of these attachments under IEEPA will not constitute a taking of private property in the Fifth Amendment sense.

Paradoxically, if IEEPA does not authorize nullification, the risk of constitutional liability is even smaller. As a general proposition, unauthorized executive action that destroys or harms private interests in property does not subject the United States to liability for a taking under the Fifth Amendment. *See, e.g., Hooe* v. *United States,* 218 U.S. 322 (1910); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579 (1952); 42 Op. Att'y Gen. 441, 445–46. To be sure, unauthorized action may be tortious, and it may subject the executive officer himself to

283

individual liability; [10] but it generally does not give rise to a constitutional claim against the government itself.

Is there any other basis for liability? The Federal Tort Claims Act is a possibility. It makes the United States liable for "tort claims" arising from the wrongful acts or omissions of officers and employees of the United States in certain circumstances. *See* 28 U.S.C. § 2674. But Congress has expressly excepted from the provisions of that Act "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In our opinion, this express exception to the Tort Claims Act would be fully applicable in the case presented here, whether or not the President's action is ultimately approved by the courts. [11]

Aside from the question of tort claims, we think it very doubtful that any other statute—IEEPA itself, Rule 64, the organic legislation establishing the Federal Reserve Bank, etc.—can be construed to grant a right of action against the United States in these circumstances. Such a grant must be made with specificity. *See United States* v. *Testan,* 424 U.S. 392, 400 (1976). Absent a contract or a claim for the return of money paid by the claimant to the government, there can be no private right to money damages in a suit against the United States unless, a federal statute "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* at 400, *citing Eastport S.S. Corp.* v. *United States,* 372 F.2d 1002–09 (Ct. Cl. 1967). We know of no federal statute that specifically grants a right of action against the United States for wrongful release of attached funds by a Federal Reserve Bank or "mandates" compensation by the United States for the damages sustained by the attachment creditors.

Finally, there is at least a theoretical possibility of liability based on contract. It is clear, of course, that the United States can be held to account in a Court of Claims for damages resulting from a breach of an express contract and a contract implied in fact. Over the years, creative lawyers have been able to exploit this potential liability by arguing

---

[10] We believe that in this case, however, the executive officer would be relieved of liability by the exculpatory provision in IEEPA.

[11] The Federal Tort Claims Act has always contained a separate, express exception for claims arising out of the administration of the Trading with the Enemy Act. *See* 28 U.S.C. § 2680(e). When Congress created IEEPA, lifting it from the Trading with the Enemy Act, it neglected to amend this provision to include IEEPA within the terms of the traditional exception. We think this was an innocent oversight. We find nothing in the relevant legislative history that suggests that Congress intended to subject the United States to liability for the mistakes made by officers and agencies of the United States in the administration of IEEPA while preserving sovereign immunity with respect to mistakes made under the identical provisions of the Trading with the Enemy Act. In any case, the general exception contained in 28 U.S.C. § 2680(a) applies to action under IEEPA, in our view.

where all else fails that their claims rest upon implied "promises" of one kind or another. We do not know what express or implied representations the Federal Reserve Bank or the organs of the government may have made to the creditors in the present case, or what consideration the creditors may have advanced in return; but we do know that the government has formally and expressly represented from the very start, in the blocking regulations themselves, that the authorization for these attachments may be withdrawn, and the government has expressly declined to provide assurance that the attached funds will ever be available to satisfy any final judgments. It seems to us that these formal representations leave relatively little room for a successful claim that the government has somehow promised to keep these funds secure for the creditors' benefit. We do not know all the facts, but we see little risk of a successful contract claim against the government itself.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*